UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * | * |

UNITEDHEALTHCARE OF
NEW YORK, INC.

and

OXFORD HEALTH INSURANCE, INC.,

      **Plaintiffs,**

v.

MARIA T. VULLO, in her official capacity as
Superintendent of Financial Services of the
State of New York,

      **Defendant.**

Civil Action
No. 17-cv-7694

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * | * |

## COMPLAINT

Plaintiffs UnitedHealthcare of New York, Inc. and Oxford Health Insurance, Inc., by their undersigned attorneys, hereby file their Complaint for Declaratory, Injunctive and Other Relief, and state in support of this Complaint as follows:

## INTRODUCTION

1.     This lawsuit arises from the emergency adoption of a New York Insurance Regulation governing benefit plan year 2017, and the proposed adoption of a second New York Insurance Regulation governing benefit plan years 2018 and beyond.  The two New York regulations are unlawful and invalid under the United States Constitution, because, *inter alia*, they directly violate, and undermine the purposes of, the federal "risk adjustment" program adopted pursuant to the Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-

148, 124 Stat. 119 ("ACA" or "Affordable Care Act"), codified in part at 42 U.S.C. §§ 18001–18122.

2.      The federal risk adjustment program protects sicker individuals by affording them greater access to affordable health insurance coverage.   The federal risk adjustment program does so by ensuring that health insurance premiums reflect only the differences in benefits provided by different insurers' health insurance plans, not the health status of individual enrollees.  The federal program accomplishes this goal by: (a) forbidding insurers from charging higher premiums to sicker enrollees, and (b) pursuant to a formula painstakingly designed by the federal Government over several years, transferring funds from insurers with healthier populations to insurers with sicker populations.

3.      The transfer of funds from insurers with healthier populations to insurers with sicker populations — *i.e.*, the risk adjustment program — lays at the heart of the ACA health care program.  Those transfers are what permit an insurer to provide affordable health insurance even if it has a sicker-than-average enrollee population.   Absent such transfers, premiums charged to sicker populations must inevitably rise.

4.      Under the ACA, a State is permitted to perform responsibilities with respect to risk adjustment within its boundaries *only if* it obtains federal approval to do so, having satisfied detailed requirements demonstrating that such a state-run program will be both appropriately designed and operated.   This lawsuit arises because Defendant has violated all of these requirements, having neither sought nor obtained federal Government approval to operate risk adjustment in the State.

5.      Specifically, the emergency regulation was promulgated by Defendant Superintendent of Financial Services of the State of New York on September 9, 2016 and was

reissued as an emergency regulation on December 7, 2016, March 6, 2017, June 21, 2017, July 31, 2017, and September 28, 2017 (the "2017 Emergency Regulation"). The 2017 Emergency Regulation purports to dictate with respect to benefit year 2017 risk adjustment operations under the ACA.

6. The proposed regulation was published in the State Register on May 3, 2017 and purports to dictate risk adjustment operations under the ACA during benefit plan years 2018 and thereafter (the "2018 Permanent Regulation").

7. The 2017 Emergency Regulation and proposed 2018 Permanent Regulation openly override the calculations and payment transfer methodologies of the federal "risk adjustment" program promulgated by the United States Department of Health and Human Services pursuant to ACA Section 1343, and purport to seize funds to be received by New York insurers pursuant to the federal risk adjustment program, and to pay such funds to other New York insurers. The 2017 Emergency Regulation and, to the extent adopted or otherwise effectuated, the 2018 Permanent Regulation, violate the United States Constitution and/or the laws of the United States for four independent reasons:

8. *First*, the 2017 Emergency Regulation and 2018 Permanent Regulation are invalid under the Supremacy Clause of the United States Constitution because they directly conflict with the ACA and its implementing regulations.

9. *Second,* the 2017 Emergency Regulation and 2018 Permanent Regulation are invalid under the Supremacy Clause of the United States Constitution because they interfere with the purposes and goals of the ACA and its implementing regulations.

10. *Third*, the 2017 Emergency Regulation and 2018 Permanent Regulation are invalid under the Fifth and Fourteenth Amendments to the United States Constitution because

they effect an unconstitutional taking of Plaintiffs' property, given that they provide for the seizure from Plaintiffs of up to 30% of the money to which they are lawfully entitled under the federal risk adjustment program calculation and payment transfer methodologies.

11.     *Fourth,* the 2017 Emergency Regulation and 2018 Permanent Regulation are invalid under the Fifth and Fourteenth Amendments to the United States Constitution because they effect an unlawful exaction of Plaintiffs' property, given that they condition Plaintiffs' right to offer insurance in the State of New York upon Plaintiffs handing over to the State up to 30% of the money to which they are lawfully entitled under the federal risk adjustment program's calculation and payment transfer methodologies.

## PARTIES

12.     Plaintiff UnitedHealthcare of New York, Inc. is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 77 Water Street, 14th Floor, New York, New York 10005.  UnitedHealthcare of New York, Inc. offers insurance policies in the individual health insurance market in the State of New York, both under and outside of the Exchange Marketplace created by the ACA.

13.     Plaintiff Oxford Health Insurance, Inc. is a corporation organized and existing under the laws of the State of New York, with its principal place of business at One Penn Plaza, 8th Floor, New York, New York 10119.  Oxford Health Insurance, Inc. offers insurance policies in the small group health insurance markets in the State of New York, outside of the Exchange Marketplace created by ACA.

14.     Defendant Maria T. Vullo is Superintendent of the New York State Department of Financial Services ("the Superintendent"), with offices at One State Street, New York, New York 10004, and is sued in her official capacity.  The Superintendent *inter alia* supervises all

insurance companies that do business in New York, and promulgated the 2017 Emergency Regulation and proposed 2018 Permanent Regulation.

15.     Defendant in her official capacity resides in this judicial district because the principal office of the Department of Financial Services of the State of New York is located in this judicial district.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, because the claims set forth in this action arise under the Supremacy Clause and the Fifth and Fourteenth Amendments of the United States Constitution, and under 42 U.S.C. § 1983, and the inherent equity powers of this Court.  The declaratory relief that Plaintiffs seek is available under 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57.  This Court has authority to grant the requested injunctive relief under 28 U.S.C. § 1651(a), Federal Rule of Civil Procedure 65, and its inherent equity powers.

17.     This Court has jurisdiction to order prospective relief in the form of a declaratory judgment and/or injunction against the Supervisor in her official capacity as an officer of an agency of the State of New York.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this judicial district in her official capacity, and also because, on information and belief, a substantial portion of the events giving rise to this action occurred therein.

## FACTUAL STATEMENT

### I.     THE AFFORDABLE CARE ACT.

19.     The ACA, enacted in 2010 and made fully operational January 1, 2014, significantly changed the private healthcare market in the United States, including with respect to

both the individual health insurance market (the purchase and sale of health insurance other than through an employer or public programs such as Medicare and Medicaid), and the small group health insurance market (the purchase and sale of employee insurance by New York employers with between 1 and 100 employees). The ACA established fora in which insurance could be bought and sold, called Health Benefit Exchanges for the individual market and Small Business Health Options Program Exchanges for the small group market. The ACA also established requirements affecting individual market and small group market health insurance bought and sold outside the Exchanges.

20.    Congress included in the ACA three interrelated "premium stabilization programs." These programs are often referred to as the "3R's": reinsurance, risk corridors, and risk adjustment. *See* ACA §§ 1341–43, 42 U.S.C. §§ 18061–63. Reinsurance and risk corridors operate during the "transition period" of the first three years of full ACA implementation (ending after benefit plan year 2016), while risk adjustment is a permanent program. 45 C.F.R. § 153.310(e); *see also* Centers for Medicare and Medicaid Services, *Reinsurance, Risk Corridors, and Risk Adjustment Final Rule* 4 (Mar. 2012), *available at*: https://www.cms.gov/CCIIO/Resources/Files/Downloads/3rs-final-rule.pdf.

## II.   THE ROLE OF THE FEDERAL GOVERNMENT AND OF THE STATES WITH RESPECT TO THE RISK ADJUSTMENT PROGRAM.

21.    At the federal level, the ACA is administered by the U.S. Department of Health and Human Services ("HHS") and its Centers for Medicare and Medicaid Services ("CMS").

22.    The ACA gives each state the option of running the risk adjustment program component of the ACA, described more fully *infra*. If a state chooses to run its own risk adjustment program, it is first required to obtain HHS approval for that program, pursuant to detailed criteria discussed *infra*. 45 C.F.R. § 153.310(a)(3) and (a)(4).

23.     If a state does not choose to run its own risk adjustment program, or chooses to do so but does not obtain HHS approval for its state program, then HHS is the agency that administers the risk adjustment program in the state. 45 C.F.R. § 153.310(a)(3) and (a)(4).  HHS regulations on that issue are clear:  A state that either does not choose to operate its own risk adjustment program or chooses to do so but does not obtain HHS approval for the state program, "*will forgo implementation of all State functions*" relating to risk adjustment.   45 C.F.R. § 153.310(a)(3) and (a)(4) (emphasis added).

24.     New York neither sought nor obtained approval to operate the risk adjustment program in the State. *See, e.g.*, November 15, 2012 letter from Governor Cuomo to CMS ("New York has determined that the State will not administer the reinsurance and risk adjustment functions in 2014 and requests federal administration of these functions."), *available at*: https://www.cms.gov/CCIIO/Resources/Technical-Implementation-Letters/Downloads/ny-exchange-letter-2.pdf.   New York accordingly must forego all functions relating to risk adjustment.  Indeed, in a June 28, 2016 letter to CMS, Defendant Vullo expressly acknowledged that fact. *See* Letter from Maria T. Vullo to Sylvia M. Burwell and Andrew Slavitt (June 28, 2016), *available at*: http://www.dfs.ny.gov/about/press/pr1609091_letter_secretary_burwell.pdf ("Because the risk adjustment program is federally mandated and administered, the states are unable to change its parameters or alter issuers' associated liabilities.").

25.     Nonetheless, two months later, on September 9, 2016, Defendant Vullo issued the 2017 Emergency Regulation, which directly conflicts with the ACA and with HHS implementing regulations and seeks to undermine the sole authority of HHS to administer risk adjustment in New York.  Defendant's failure to abide by HHS requirements and limitations gives rise to this lawsuit.

### III.     THE ACA RISK ADJUSTMENT PROGRAM.

#### A.     The Purpose of Risk Adjustment.

26.     The ACA protected relatively sicker individuals by prohibiting insurers from charging higher premiums based upon an individual's health status or medical history.  ACA § 1201(2)(A); 42 U.S.C. §§ 300gg-1 - 300gg-4.  Given those restrictions, an insurer might be incentivized to seek to attract only healthy enrollees, and in any event, would be unfairly disadvantaged if its enrollees were relatively sicker and its costs concomitantly higher.

27.     The risk adjustment program addressed these programs by spreading financial risk across insurers providing individual or small group health insurance in a state and by "protect[ing] consumers' access to a range of robust coverage options by reducing the incentive for insurance companies to seek only to insure healthy individuals."  Centers for Medicare and Medicaid Services, *The Three Rs: An Overview* (Oct. 1, 2015), *available at*: https://www.cms.gov/Newsroom/MediaReleaseDatabase/Fact-sheets/2015-Fact-sheets-items/2015-10-01.html.  Risk adjustment was designed to encourage insurers to compete for enrollees' business based on the value and efficiency of an insurer's particular health insurance plan, rather than competing only for the healthiest enrollees.

28.     Risk adjustment works as follows.  Insurers with enrollees who are healthier than the state-covered average must make payments into the risk adjustment program.  Those funds are then transferred to insurers that incur higher claim costs due to having enrollees who are sicker than the state-covered average.  Sections 1343(a)(1) and (2) of the ACA thus require charges to "low actuarial risk plans" and payments to "high actuarial risk plans":

> [E]ach State shall assess a charge on health plans and health insurance issuers [in the individual or small group market within the state] . . . if the actuarial risk of the enrollees of such plans or coverage for a year is less than the average actuarial risk of all enrollees in all plans or coverage in such State for such year that

> are not self-insured group health plans (which are subject to the provisions of the Employee Retirement Income Security Act of 1974).

ACA § 1343(a)(1).

> [E]ach State shall provide a payment to health plans and health insurance issuers [in the individual or small group market within the state] . . . if the actuarial risk of the enrollees of such plans or coverage for a year is greater than the average actuarial risk of all enrollees in all plans and coverage in such State for such year that are not self-insured group health plans (which are subject to the provisions of the Employee Retirement Income Security Act of 1974).

ACA § 1343(a)(2).

29.     In short, "[t]he risk adjustment program is a permanent program created by Section 1343 of the Affordable Care Act that transfers funds from lower risk . . . plans to higher risk . . . plans in the individual and small group markets, inside and outside the Exchanges." HHS, 78 Fed. Reg. 15,409, 15,415 (Mar. 11, 2013).

**B.     HHS's Development of the Federal Risk Adjustment Program and Methodology, Which Provided Defendant Ample Opportunity Either to Weigh In or to Adopt DFS' Own Risk Adjustment Program.**

30.     The ACA requires the Secretary of HHS, "in consultation with the States," to develop "criteria and methods" to implement the risk adjustment program.  ACA § 1343(b). Those criteria "may" be "similar to" those methods used in Medicare Part C (Medicare managed care, also known as "Medicare Advantage") or Medicare Part D (Medicare prescription drug benefit). *Id.*

31.     Following the Federal Register publication for public comment of proposed regulations on July 15, 2011, 76 Fed. Reg. 41,865 (Jul. 15, 2011), HHS in March of 2012 published in the Federal Register final regulations setting forth the basic framework for the implementation of the risk adjustment program.  77 Fed. Reg. 17,219 (Mar. 23, 2012).  During

the interim, in September 2011, HHS published a white paper reporting on the methodology of the initial proposed risk adjustment model, including a "detailed technical discussion." Center for Consumer Information and Insurance Oversight, *Risk Adjustment Implementation Issues* 3 (Sept. 12, 2011), *available at:* https://www.cms.gov/CCIIO/Resources/Files/Downloads/riskadjustment_whitepaper_web.pdf. HHS invited responses to the white paper in order to "inform the HHS-developed Federally-certified risk adjustment methodology." *Id.* In February 2012, HHS published a bulletin to provide information about its approach for defining actuarial value for health plans, which also "welcom[ed] public input" and provided a way to contact the agency. CMS, *Actuarial Value and Cost-Sharing Reductions Bulletin* (Feb. 24, 2012), *available at:* https://www.cms.gov/CCIIO/Resources/Files/Downloads/Av-csr-bulletin.pdf.

32. Shortly after publication of the final rule in March 2012, HHS issued a new bulletin on the risk adjustment program, which included a summary of the program and a section focusing on "Stakeholder Communication." CMS, *Bulletin on the Risk Adjustment Program: Proposed Operations by the Department of Health and Human Services* (May 1, 2012), *available at:* https://www.cms.gov/CCIIO/Resources/Files/Downloads/ppfm-risk-adj-bul.pdf.

33. The bulletin acknowledged that responses to the white paper were "useful in informing model development and the approach to data collection," and that HHS was "considering all comments received as [it] develop[ed] the risk adjustment methodology." *Id.* at 4. In the bulletin, HHS set out a schedule for engagement with stakeholders about the risk adjustment methodology. This included a public meeting in May 2012, ongoing group calls, a data testing session with insurers in the fall of 2012, and a reminder of the deadlines for submitting an alternative State methodology. *Id.* at 11–12.

34.     In May of 2012, HHS held a two-day Risk Adjustment Spring Meeting to "provide an opportunity to hear from a variety of interested parties as the Federal risk adjustment methodology is being developed," before which stakeholders were invited to submit comments. *See* 77 Fed. Reg. 21,775–76 (notice of meeting).   The meeting included, among many other presentations, a session on "State Flexibility and Alternate Methodologies."  *See* CMS, *State Flexibility    and    Alternate    Methodologies*    (May    7,    2012),    *available    at:* https://www.cms.gov/CCIIO/Resources/Files/Downloads/fm-1e-state-flex.pdf.

35.     After its Risk Adjustment meeting, HHS continued to release publications designed to engage stakeholders in the development of its risk adjustment methodology.  *See, e.g.*, CMS, *Bulletin on the Transitional Reinsurance Program* (May 31, 2012), *available at:* https://www.cms.gov/CCIIO/Resources/Files/Downloads/reinsurance-program-bulletin-5-31-2012.pdf.

36.     In late 2012, HHS published in the Federal Register for public comment its proposed methodology for the administration of the risk adjustment program, including the calculation of risk adjustment assessments and payments for the 2014 plan year (the first year of ACA operations).   77 Fed. Reg. 72,913, 73,118 (Dec. 7, 2012).   HHS received "approximately 420 comments" from a wide variety of stakeholders, including health insurance companies, healthcare providers, consumer and health insurance industry advocacy groups, employers, state agencies and individuals.  78 Fed. Reg. 15,409, 15,415 (Mar. 11, 2013).   HHS's methodology for the administration and operation of the federal risk adjustment program was published in the Federal Register on March 11, 2013, and became final on April 30, 2013. *Id.* at 15,410.

**C.     The State Option to Operate Risk Adjustment, Subject to HHS Approval of the State Program and Methodology.**

37.     In the proposed rule, HHS provided that:

> A State approved or conditionally approved by the Secretary to operate an Exchange may establish a risk adjustment program, or have HHS do so on its behalf.  Section 1343 of the Affordable Care Act requires each State to operate a risk adjustment program. In States that have elected not to operate their own risk adjustment program, HHS will operate a program on their behalf.

*Id.* at 15,415.

38.    HHS also proposed that a State operating its own risk adjustment program may use a risk adjustment methodology developed by HHS or may elect to submit an alternate methodology to HHS for approval.  In section III.B.1 of the proposed rule, HHS proposed standards for its approval of a State-operated risk adjustment program (regardless of whether a State elects to use the HHS-developed methodology or an alternate, federally certified risk adjustment methodology).   In section III.B.3 of the proposed rule, HHS described the methodology that HHS would use when operating a risk adjustment program on behalf of a State.   HHS proposed that States operating a risk adjustment program could use this methodology or submit an alternate methodology, in a process described in section III.B.4 of the proposed rule.  Finally, in section III.B.5 of the proposed rule, HHS described the data validation process it proposed to use when operating a risk adjustment program on behalf of a State.  These provisions are discussed fully in the proposed rule at 77 Fed Reg. at 73,123–49.

39.     HHS in the proposed rule proposed an approval process for States seeking to operate their own risk adjustment programs.  Specifically, HHS proposed a new paragraph (c) in § 153.310, entitled "State responsibility for risk adjustment," which sets forth a State's responsibilities with regard to risk adjustment program operations.  HHS proposed that if a State is operating a risk adjustment program for a benefit year, the State must administer the program through an entity that meets certain standards.  These standards would ensure the entity has the capacity to operate the risk adjustment program throughout the benefit year and is able to

administer the federally certified risk adjustment methodology the State has chosen to use.  HHS proposed in § 153.310(d) that a State submit to HHS information that establishes that it and its risk adjustment entity meet the criteria set forth in § 153.310(c).

40.    Because of the unique timing issues for approving a State-operated risk adjustment program, HHS in the proposed rule proposed a transitional policy for benefit year 2014.  It proposed not to require that a State-operated risk adjustment program receive prior approval for benefit year 2014.  Instead, it proposed a transitional, consultative process that would commence shortly after the provisions of this final rule were effective.  However, HHS specifically stated that for years 2015 and thereafter, HHS approval would be required of any State-operated risk adjustment program.  78 Fed. Reg. 72,321, 72,328, 72,383 (Dec. 2, 2013); 79 Fed. Reg. 13,743, 13,748 (Mar. 11, 2014) (referencing CMS's decision to approve an alternate methodology for 2015); *see also* 78 Fed. Reg. at 15,416 ("[A]ny State that begins operation of risk adjustment under this transitional process must obtain formal certification for benefit year 2015.")

41.    As HHS explained when it adopted its final rule, "[c]ommenters generally agreed with our approach to approving State risk adjustment programs beginning in benefit year 2015," *id.*, and HHS finalized the provisions as proposed.  *See id.*; 45 C.F.R. § 153.310.  HHS also adopted the proposed transition rule for 2014, reasoning:

> We proposed the transitional policy based on the unique circumstances of 2014, and we do not anticipate extending it to future years.  Although we are mindful of concerns that States may not be fully ready to operate a complex risk adjustment program for benefit year 2014, we note that each aspect of a State's operations (including data collection) must be performed in line with one of the Federally certified risk adjustment methodologies published in this final rule.  Finally, we note that any State that begins operation of risk adjustment under this transitional process must obtain formal certification for benefit year 2015.  We believe

> this process is sufficiently robust to ensure any State operating risk
> adjustment in 2014 will be prepared to do so.

78 Fed. Reg. at 15,416.

42.     Thus, the 2013 HHS final regulations established that HHS would operate and
administer the risk adjustment program for years 2015 and thereafter, *unless* a State with a State-
run Exchange opted to create, *and* secure federal approval of, its own "alternative" risk
adjustment program.  45 C.F.R. § 153.310.  Furthermore, in order to remain approved, a State
must also submit yearly reports to HHS and publish its own State notice of benefit and payment
parameters for its risk adjustment mechanism by March 1 of the prior plan year.  *See* 45 C.F.R.
§ 153.330; CMS, *Reinsurance, Risk Corridors, and Risk Adjustment Final Rule* 18 (Mar. 2012),
*available at*: https://www.cms.gov/CCIIO/Resources/Files/Downloads/3rs-final-rule.pdf; CMS,
*Risk Adjustment Methodology Overview* 32–33 (May 21–23, 2012), *available at*:
https://www.cms.gov/CCIIO/Resources/Presentations/Downloads/hie-risk-adjustment-
methodology.pdf.

43.     HHS regulations are explicit that a State that does not obtain approval to operate
its own risk adjustment program may *not* alter the HHS risk adjustment program that will instead
operate in the State:

> Any State that elects to operate an Exchange but does not elect to
> administer risk adjustment *will forgo implementation of all State
> functions in this subpart* [referencing Subpart D, "State Standards
> Related to the Risk Adjustment Program"], and *HHS will carry
> out all of the provisions of this subpart* on behalf of the State.

45 C.F.R. § 115.310(a)(3) (emphasis added).

44.     Reiterating the point, 45 C.F.R. § 115.310(a)(4) provides:

> Beginning in 2015, any State that is approved to operate an
> Exchange and elects to operate risk adjustment *but has not been
> approved by HHS to operate risk adjustment prior to publication
> of its State notice of benefit and payment parameters for the*

> *applicable benefit year, will forgo implementation of all State functions in this subpart* [referencing Subpart D, "State Standards Related to the Risk Adjustment Program"], *and **HHS will carry out all of the provisions of this subpart** on behalf of the State.*

(emphasis added).

### D. New York Failed to Seek or Obtain Approval for Its Own Risk Adjustment Program.

45.     The State of New York has never created nor obtained approval for its own risk adjustment program.   HHS therefore operates risk adjustment in New York pursuant to the federal risk adjustment program. *See id.; see also* 81 Fed. Reg. 12,203, 12,230 (Mar. 8, 2016) ("[I]f a State is not approved to operate or chooses to forgo operating its own risk adjustment program, HHS will operate risk adjustment on the State's behalf.").   Massachusetts is the only state that chose to create and obtain approval for its own risk adjustment program, *see* 78 Fed. Reg. at 15,415 ("Massachusetts is the only State electing to operate a risk adjustment program for the 2014 benefit year"); 79 Fed. Reg. 13,743, 13,748 (Mar. 11, 2014) ("recertifying" Massachusetts' alternative methodology); 80 Fed. Reg. 10,749, 10,772 (Feb. 27, 2015) (same), but that State's risk adjustment program was not recertified for 2017. *See* 81 Fed. Reg. at 12,230.   Therefore, for the 2017 and 2018 benefit plan years, New York and all other states are subject to the federal HHS-administered risk adjustment program. *Id.* ("HHS will operate risk adjustment in all States for the 2017 benefit year.").

## IV.   THE FEDERAL RISK ADJUSTMENT METHODOLOGY.

46.     In March 2013, HHS issued the final methodology it would use to calculate risk adjustment assessments and payments for the 2014 plan year. *See* 78 Fed. Reg. 15,409, 15,419–52 (Mar. 11, 2013).   HHS's final risk adjustment methodology is detailed and complex and has been amended by HHS over time.   As noted, the ultimate purpose is to transfer funds from lower

15

risk plans to higher risk plans in the individual and small group markets. The methodology's key features are as follows:

47.     *First*, the HHS methodology utilizes a "concurrent [data] model," meaning that it calculates risk adjustment assessments and payments using data provided by insurers from the same benefit plan year in which those assessments or payments will apply. 77 Fed. Reg. 72,913, 73,118, 73,125 (Dec. 7, 2012); 78 Fed. Reg. 15,409, 15,420 & 15,516 (Mar. 11, 2013).

48.     *Second*, the HHS risk adjustment program operates as a "transfer" of funds from low actuarial risk health insurance plans to high actuarial risk health insurance plans, with HHS as the intermediary. These transfers are based on the average statewide premium payment, rather than on the plans' actual earned premiums. This means that plans with below-average premiums will experience relatively greater charges or receipts depending on their status as a low or high actuarial risk benefit plan, while plans with above-state average premiums will experience somewhat less significant charges or receipts by the program. 78 Fed. Reg. at 15,431–32.

49.     *Third*, the primary input for calculating risk adjustment is the actuarial "risk score" for each of a plan's enrollees. High risk scores are assigned to individuals with more complex chronic health needs that are likely to result in higher health insurance claims costs, while low risk scores assume less healthcare needs and relatively lower health insurance claims costs. *See id.* at 15,431–43.

50.     Risk scores begin with a coefficient for each individual based on age and gender, with infants all starting with the same coefficient. This demographic-based coefficient is supplemented over time if the individual is assigned to one or more hierarchal condition categories ("HCCs") that correspond to given chronic conditions or diagnoses. Examples of HCCs include "Asthma," "Drug Dependency," "Diabetes without Chronic Complications," and

"HIV/AIDs."  HCCs are excluded from the risk adjustment score if they are not predictive of healthcare costs or are not medically significant.  *Id.* at 15,422–30.

51.    The coefficient of any applicable HCC, which can also be adjusted for the interaction and severity of the diagnoses, is added to the individual's demographic coefficient. *Id.* at 15,422.  These individual scores are then used to calculate a plan's average risk score, which is a weighted average of the risk scores of all individual enrollees.  Finally, adjustments are made for a variety of factors, including actuarial value and geographic cost variation within a state. *Id.* at 15,430–34.

52.    Enrollees are associated with HCCs only for the benefit plan year in which a healthcare provider diagnoses a condition (or recognizes a diagnosis), properly codes the diagnosis, and transmits the information to the insurer.  *See id.* at 15,417, 15,420, 15,437, 15,499. Thus, for example, an individual receiving a diabetes diagnosis will receive a diabetes HCC only when the diagnosis was received while enrolled in the plan during the applicable year, and only if the physician records and transmits the diagnosis to the insurer.  *See id.*

53.    *Fourth*, the HHS risk adjustment model relies on risk scores, and not on prescription drug data, to identify subscriber diagnoses.  *Id.* at 15,430–34.  That choice was the subject of considerable discussion among insurers and other stakeholders, some of whom filed comments arguing that the use of prescription drug data would result in more accurate risk adjustment.  Variants on this theme were also advanced, including using prescription drug data but limiting that data to non-discretionary drugs, such as insulin, cancer chemotherapies, and others, or limiting the data to high-impact drugs that treat select conditions.  *See, e.g.*, Or. Dep't of Consumer and Business Services, *Comment to HHS-9964-P, Patient Protection and Affordable Care Act: Benefit and Payment Parameters for 2014*, at *1–2 (Jan. 3, 2013),

*available at:* https://www.regulations.gov/document?D=CMS-2012-0152-0174; DC-BlueCross

BlueShield, *Comments on the Proposed Rule: "Patient Protection and Affordable Care Act;*

*HHS Notice of Benefit and Payment Parameters for 2014"* [HHS-9964-P], at *49 (Dec. 28,

2012), *available at:* https://www.regulations.gov/document?D=CMS-2012-0152-0270.

However, HHS raised the concern that reliance on prescription drug data "could create adverse

incentives to modify discretionary prescribing." 77 Fed. Reg. at 73,128.

54.      As discussed above, insurers with enrollees who are healthier than the state-

covered average must make payments into the risk adjustment program ("payors"). Insurers that

incur higher claim costs due to having enrollees who are sicker than the state-covered average

are entitled to receive risk adjustment payments ("receivers").   The amount of each payor's

obligation to make risk adjustment payments, and each receiver's right to receive risk adjustment

payments, for a given benefit year are announced by CMS in June of the following year.   The

actual transfer of funds takes place beginning in August.

55.      For the 2014 benefit year, the first full benefit plan year of the CMS-administered

risk adjustment program, New York payors' total risk adjustment payment obligations totaled

approximately $141 million with respect to the individual market and $195 million with respect

to the small group market.  *See* CMS, *Summary Report on Transitional Reinsurance Payments*

*and Permanent Risk Adjustment Transfers For the 2014 Benefit Year*, Table 6, *available at:*

https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-

Programs/Downloads/RI-RA-Report-REVISED-9-17-15.pdf.

56.      Nine months after issuing its final rule for plan year 2014, HHS published a

notice of its proposed risk adjustment methodology for plan year 2015. *See* 78 Fed. Reg. 72,321

(Dec. 2, 2013).  During the comment period, HHS received 129 comments from a variety of

stakeholders, including health insurance companies, industry groups, and States, and its final rule was published in March 2014.  79 Fed. Reg. 13,743, 13,748 (Mar. 11, 2014).

57.     For the 2015 benefit year, New York payors' total risk adjustment payment obligations totaled approximately $230 million with respect to the individual market and $342 million with respect to the small group market.  *See* CMS, *Summary Report on Transitional Reinsurance Payments and Permanent Risk Adjustment Transfers For the 2015 Benefit Year*, Table 4, *available at*: https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/June-30-2016-RA-and-RI-Summary-Report-5CR-063016.pdf.

58.     In November 2014, HHS published a notice of its proposed risk adjustment methodology for plan year 2016.  *See* 79 Fed. Reg. 70,673 (Nov. 26, 2014).  HHS received 313 comments from a wide variety of stakeholders, including States, and considered those comments in formulating its final rule that was ultimately finalized on February 27, 2015.  80 Fed. Reg. 10,749, 10,755 (Feb. 27, 2015) (final rule for plan year 2016).

59.     For the 2016 benefit year, New York payors' total risk adjustment payment obligations totaled approximately $194 million with respect to the individual market and $284 million with respect to the small group market.  *See* CMS, *Summary Report on Transitional Reinsurance Payments and Permanent Risk Adjustment Transfers For the 2016 Benefit Year*, Table 4, *available at*: https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/Summary-Reinsurance-Payments-Risk-2016.pdf.

60.     In December 2015, HHS again solicited public comment on its risk adjustment methodology when it published for comment its proposed changes to the federal risk adjustment model for plan year 2017.  80 Fed. Reg. 75,487 (December 2, 2015).  This time, HHS received

524 comments from insurance companies, state agencies, and other stakeholders offering comments on the proposed changes. 81 Fed. Reg. 12,203, 12,210 (Mar. 8, 2016). On March 8, 2016, CMS published its Final Rule for plan year 2017, taking into account the comments it received on the proposed rule. *See id.*

61.     In March of 2016, HHS published a detailed discussion paper in advance of a public Risk Adjustment Methodology Meeting, setting out for stakeholders its proposed approach to risk adjustment and possible improvements to the mechanism for the future. *See* CMS, Discussion Paper, *HHS-Operated Risk Adjustment Methodology Meeting* (Mar. 24, 2016), *available        at*:        https://www.cms.gov/CCIIO/Resources/Forms-Reports-and-Other-Resources/Downloads/RA-March-31-White-Paper-032416.pdf.

62.     HHS on June 8, 2016, largely in response to feedback on the March 2016 final rule and discussion paper, announced that it would be proposing alterations to its methodology for upcoming plan years through two significant changes. *First*, it proposed that beginning in the 2017 plan year, its methodology would include an adjustment for partial-year enrollees to "more accurately account[] for the costs of short term enrollees in ACA-compliant risk pool[s]." CMS, *Strengthening the Marketplace - Actions to Improve the Risk Pool* (June 8, 2016), *available   at*:   https://www.cms.gov/Newsroom/MediaReleaseDatabase/Fact-sheets/2016-Fact-sheets-items/2016-06-08.html.

63.     *Second*, HHS announced it would, beginning in 2018, incorporate prescription drug utilization data into its risk assessment methodology. *Id.* HHS has also indicated that in response to feedback from various stakeholders, it will begin providing insurers with early estimates of plan-specific risk adjustment calculations to assist plans in setting premiums, and it will continue to explore options to modify the risk adjustment mechanism to better account for

high-cost enrollees. *See* Andy Slavitt, *Comments of HHS Acting Administrator at J.P. Morgan Annual Health Care Conference* (Jan. 11, 2016), *available at*: http://wayback.archive-it.org/2744/20161109125758/https://blog.cms.gov/2016/01/12/comments-of-cms-acting-administrator-andy-slavitt-at-the-j-p-morgan-annual-health-care-conference-jan-11-2016/; Kevin Counihan, *Building on Premium Stabilization for the Future*, HHS Blog (Aug. 11, 2016), *available                                    at*:                              http://wayback.archive-it.org/2744/20170118125734/https://blog.cms.gov/2016/08/11/building-on-premium-stabilization-for-the-future/.

64.     In September 2016, HHS incorporated these changes through a proposed rule, which was open for public comment through October 6, 2016, *see* 81 Fed. Reg. 61,455, 61,467 (Sept. 6, 2016), and finalized on December 22, 2016. *See* 81 Fed. Reg. 94,058, 94,071 (Dec. 22, 2016).  The 2017 and 2018 risk adjustment mechanism thus includes "[a]djustment factors for partial year enrollment," and the 2018 risk adjustment mechanism also includes "prescription drug utilization factors" and "modifying transfers to account for high-cost enrollees." *Id.*  The risk adjustment models will be "recalibrate[d]" "using 2015 MarketScan data blended with 2013 and 2014 MarketScan data following the publication of the final Payment Notice for the 2018 Benefit Year." *Id.*

65.     Plaintiff UnitedHealthcare of New York, Inc. has been in the past, and is expected to be with respect to benefit years 2017 and 2018, a recipient of risk adjustment payments under the New York individual market.  Plaintiff Oxford Health Insurance, Inc. has been in the past, and is expected to be with respect to benefit years 2017 and 2018, a recipient of risk adjustment payments under the New York small group market.

## V.    THE REQUIREMENTS FOR OBTAINING HHS APPROVAL OF A STATE RISK ADJUSTMENT PROGRAM.

66.    HHS regulations set forth detailed requirements for a State to obtain requisite approval of its own risk adjustment program.  A State must submit a complete description of its risk adjustment model, including—(1) (i) the factors to be employed in the model, including but not limited to demographic factors, diagnostic factors, and utilization factors, if any; (ii) the qualifying criteria for establishing that an individual is eligible for a specific factor; (iii) the weight assigned to each factor; and (iv) the schedule for the calculation of individual risk scores; (2) a complete description of the calculation of plan average actuarial risk, (3) a complete description of the calculation of payments and charges, (4) a complete description of the risk adjustment data collection approach, and (5) the schedule for the risk adjustment program.  45 C.F.R. §§ 153.330(a)(1)(i), 153.320(b).   The State must also set forth the calibration methodology and frequency of calibration and the statistical performance metrics specified by HHS.  45 C.F.R. §§ 153.330(a)(1)(ii) and (iii).

67.    The State request for approval must include the extent to which the methodology: (i) accurately explains the variation in health care costs of a given population; (ii) links risk factors to daily clinical practice and is clinically meaningful to providers; (iii) encourages favorable behavior among providers and health plans and discourages unfavorable behavior; (iv) uses data that is complete, high in quality, and available in a timely fashion; (v) is easy for stakeholders to understand and implement; (vi) provides stable risk scores over time and across plans; and (vii) minimizes administrative costs.  45 C.F.R. § 153.330(a)(2).

68.    A State risk adjustment methodology will be certified by HHS based on the criteria listed above, as well as whether the methodology complies with the risk adjustment

22

program requirements; accounts for risk selection across metal levels; and each of the elements of the methodology are aligned.  45 C.F.R. § 153.330(b).

## VI.   NEW YORK HAS NOT ESTABLISHED AND OBTAINED APPROVAL FOR ITS OWN RISK ADJUSTMENT PROGRAM.

69.   As noted above, a State may establish its own risk adjustment program, subject to federal approval of that risk adjustment program and other requirements.  *See* 45 C.F.R. § 153.310(a)(1).  New York has never sought, much less obtained, HHS approval for its own risk adjustment program.

70.   Specifically, New York informed HHS that it would not be establishing its own risk adjustment program but would rely upon the federal Government to operate that program. *See, e.g.*, November 15, 2012 letter from Governor Cuomo to CMS ("New York has determined that the State will not administer the reinsurance and risk adjustment functions in 2014 and requests federal administration of these functions.")   Beginning in plan year 2014, the Superintendent suspended New York's pre-existing risk adjustment program for individual and small group health insurance markets, because of the full implementation of the ACA. Therefore, since 2014, New York's individual and small group health insurance markets have been subject solely to HHS's federal risk adjustment program.  *See Statement of the Reasons for Emergency Measure*, Sixth Amendment to 11 NYCRR 361 (Insurance Regulation 146) (Sept. 9, 2016) (acknowledging that New York is "subject only to the federal program").

71.   Despite the State's failure to establish and obtain federal approval for its own risk adjustment program, the Superintendent has issued the 2017 Emergency Regulation and proposed 2018 Permanent Regulation, which brazenly purport to displace core components of the HHS risk adjustment methodology with one of her choosing.  The Superintendent issued both the 2017 Emergency Regulation and proposed 2018 Permanent Regulation notwithstanding the

explicit, straightforward legal requirement that a State must satisfy the detailed procedural requirements set forth in HHS regulations for obtaining HHS approval, *see* ¶¶ 60–62, *supra*, if it wishes to adopt a risk adjustment program different than that promulgated by HHS, *see* 45 C.F.R. § 153.310(a)(3) ("Any State that . . . does not elect to administer risk adjustment will forgo implementation of all State functions" relating to the Risk Adjustment Program); 45 C.F.R. § 153.310(a)(4) ("Beginning in 2015, any State that. . . elects to operate risk adjustment but has not been approved by HHS to operate risk adjustment prior to publication of its State notice of benefit and payment parameters for the applicable benefit year, will forgo implementation of all State functions" relating to the Risk Adjustment Program).

## VII. THE 2017 EMERGENCY REGULATION AND 2018 PERMANENT REGULATION.

72. On September 9, 2016, Defendant promulgated 11 NYCRR 361, amend. 6 (the 2017 Emergency Regulation), entitled "Establishment and Operation of Market Stabilization Mechanisms for Certain Health Insurance Markets." The 2017 Emergency Rule applies to the risk adjustment payments that receivers are to collect from the federal Government starting in August 2018 with respect to their New York health plan operations during benefit plan year 2017. The Superintendent has reissued the 2017 Emergency Regulation five times, on December 7, 2016, March 6, 2017, June 21, 2017, July 31, 2017, and September 28, 2017.

73. On May 3, 2017, Defendant, acting in her official capacity as Superintendent of Financial Services of the State of New York, published a proposed regulation, to be promulgated as 11 NYCRR 361, amend. 6 (the 2018 Permanent Regulation). Like the 2017 Emergency Regulation, the 2018 Permanent Regulation is entitled "Establishment and Operation of Market Stabilization Mechanisms for Certain Health Insurance Markets." The 2018 Permanent Regulation applies to the risk adjustment payments that receivers are to collect from the federal

Government starting in August of 2019 and thereafter with respect to their New York health plan operations during benefit year 2018 and thereafter. For purposes relevant to this lawsuit, the 2017 Emergency Regulation and proposed 2018 Permanent Regulation are substantively identical, except that the former applies only to the small group market for the 2017 benefit plan year, while the latter applies to both the small group and individual markets for the 2018 benefit plan year and beyond.

74. As discussed in detail in Section IV., *supra,* HHS has through its risk adjustment program and methodology established a means by which insurers with healthier than State average enrollees (payors) must, using HHS as a conduit, make payments to insurers with sicker than State average enrollees (receivers). As discussed in detail in Section V., *supra*, a State like New York that has not sought and obtained HHS approval for its own State risk adjustment methodology must forego all responsibilities with respect to risk adjustment and defer all administration to HHS.

75. The 2017 Emergency Regulation and proposed 2018 Permanent Regulation constitute a frontal assault upon the federally-administered risk adjustment program and methodology. Unhappy with the results of the federally-defined methodology, the Superintendent through the 2017 Emergency Regulation and proposed 2018 Permanent Regulation purports to seize up to 30% of the federal risk adjustment payments owed to insurers with high risk claims costs (as calculated and reported in the HHS June 30th annual report) and to redistribute that money to the New York State insurers with lower than State average claims costs to whom those payments are not owed under the federal risk adjustment program. The Superintendent's actions are in direct contravention of the federal program's goal, intent, legal methodology, and annual June 30th report.

76.     Specifically, the 2017 Emergency Regulation and proposed 2018 Permanent Regulation provide:

> [E]very carrier in the small group health insurance market that is designated as a receiver of a payment transfer from the federal risk adjustment program *shall remit to the superintendent an amount equal to a uniform percentage of that payment transfer for the market stabilization pool.*   The uniform percentage shall be calculated as the percentage necessary to correct any one or more of the adverse market impact factors specified in subdivision (b)(1) of this section.

*Id.* at 361.9(e)(1) (emphasis added).   Conversely, the Regulations specify that every carrier designated as a *payor* of a risk adjustment payment under the federal risk adjustment program (those with lower than State average claims costs) "shall receive from the superintendent an amount equal to the uniform percentage of that payment transfer." *Id.* at 361.9(e)(2)(i).

77.     The Regulations provide that the Superintendent will facilitate this redistribution of federal risk adjustment payments by "send[ing] a billing invoice to each insurer [with higher than State average claims costs and] require[] payment into the [New York] market stabilization pool after the federal risk adjustment results are released pursuant to 45 CFR section 153.310(e)." *Id.* at 361.9(e)(1)(i).   These required payments to the Superintendent must be made "[w]ithin ten business days of the later of its receipt of invoice from the superintendent or receipt of its risk adjustment payment from" HHS. *Id.* at 361.9(e)(1)(ii).   The Superintendent will subsequently "send notification to each carrier [with lower than State average claims costs] of the amount the carrier will receive as a distribution from the [New York] market stabilization pool" and "make a distribution to each carrier after receiving all payments from payors." *Id.* at 361.9(e)(2)(ii)–(iii).

78.     The Regulations provide that the amount remitted to the Superintendent is within the Superintendent's discretion, to be determined "based on reasonable actuarial assumptions,"

and may be up to "*30 percent* of the amount to be received from the federal risk adjustment program." *Id.* at 361.9(e)(1) (emphasis added).

79.     The Superintendent has announced that she intends to exercise the maximum authority purportedly afforded by the 2017 Emergency Regulation.  Specifically, on April 14, 2017, the Superintendent issued a "Guidance Regarding Emergency Risk Adjustment Regulation for the 2017 Plan Year for the Small Group Market" (11 NYCRR 361.9) ("Guidance Document") stating: "Based on reasonable actuarial assumptions and all available information regarding the New York small group market for the 2017 plan year, the Superintendent has determined that a 30% uniform percentage adjustment will, *absent extraordinary circumstances*, be used in applying the market stabilization mechanism for the 2017 plan year."  Guidance Document (emphasis added).

80.     By authorizing the Superintendent to reverse up to 30 percent of risk adjustment payments made pursuant to HHS's federal risk adjustment mechanism, the 2017 Emergency Regulation and proposed 2018 Permanent Regulation purport directly to displace the HHS risk adjustment program, including its risk adjustment methodology and calculations, to which the State is subject under the ACA.

81.     The Superintendent through the 2017 Emergency Regulation and proposed 2018 Permanent Regulation is thus purporting to change the calculation of risk adjustment payments without fulfilling any of the following procedural requirements attendant to the adoption of a state risk adjustment program, *see* Section V., *supra*:

- Submit to HHS a complete description of its risk adjustment model, including factors to be employed in the model, qualifying criteria for establishing individual eligibility for a specific factor, weights assigned to each factor, the schedule for calculating individual risk scores;

- Submit to HHS a complete description of the calculation of plan average actuarial risk;

- Submit to HHS a complete description of the calculation of payments and charges;

- Submit to HHS a complete description of the risk adjustment data collection approach;

- Submit to HHS the schedule for the risk adjustment program;

- Discuss in a request for HHS approval the extent to which the proposed program's methodology: (i) accurately explains the variation in health care costs of a given population; (ii) links risk factors to daily clinical practice and is clinically meaningful to providers; (iii) encourages favorable behavior among providers and health plans and discourages unfavorable behavior; (iv) uses data that is complete, high in quality, and available in a timely fashion; (v) is easy for stakeholders to understand and implement; (vi) provides stable risk scores over time and across plans; and (vii) minimizes administrative costs; and

- Obtain HHS approval.

82.    Instead, New York has simply gone ahead and established a retroactive State risk adjustment program on its own.

## VIII.   THE 2017 EMERGENCY REGULATION AND PROPOSED 2018 PERMANENT REGULATIONS REPRESENT A DIRECT ATTACK ON THE FEDERAL RISK ADJUSTMENT FORMULA.

83.    As noted in ¶ 15, *supra*, risk adjustment is a federal "stabilization program." The very title of the New York Regulation, "Establishment and Operation of Market Stabilization Mechanisms for Certain Health Insurance Markets," makes obvious what the Superintendent seeks to do—that is, to simply create an alternative risk adjustment formula outside of the process prescribed by HHS. In light of the specific procedures established under federal law for State involvement in risk adjustment, such action is inconsistent with—indeed, directly contravenes—the federal mechanism.

84.    The Superintendent's own explanation for her rulemaking demonstrates her effort to unilaterally re-write the federal risk adjustment formula. The Superintendent states that she "has been assessing the federal risk adjustment program developed under the federal Affordable Care Act" and has determined that "the calculations for the federal risk adjustment program do

not take into account certain factors, resulting in unintended consequences." 11 NYCRR 361.9(a)(1) & (2).

85.    The federal risk adjustment formula lies at the heart of the federal risk adjustment program and methodology.  As discussed in detail in Section IV., *supra*, this codified formula was developed over several years, through a series of white papers, workshops, and discussions, all with multiple opportunities for input, and subject to several revisions over time:

$$T_i = \left[ \frac{PLRS_i \cdot IDF_i \cdot GCF_i}{\sum_i (s_i \cdot PLRS_i \cdot IDF_i \cdot GCF_i)} - \frac{AV_i \cdot ARF_i \cdot IDF_i \cdot GCF_i}{\sum (s_i \cdot AV_i \cdot ARF_i \cdot IDF_i \cdot GCF_i)} \right] \bar{P}_s$$

86.    The formula includes the following factors among others:

- a plan liability risk score (PLRS), which reflects the plan's actuarial value as well as the plan's enrollee health status risk;

- an induced demand factor (IDF), which reflects the anticipated induced demand associated with the plan's cost sharing (metal) level;

- a geographic cost factor (GCF), which reflects prevailing utilization and expenditure patterns in the geographic location of the plan's enrollees;

- the actuarial value (AV) of the plan's benefits (metal level);

- the Statewide Average Premium ($P_S$); and

- the plan's allowable rating factor (ARF), which reflects the relative amount a plan can charge given the age of its enrollees.

87.    The 2017 Emergency Regulation and proposed 2018 Permanent Regulation represent a direct attack upon the HHS risk adjustment formula without any effort to comply with the substantive and procedural requirements for substituting a state formula.  Indeed, the Superintendent admits as much, asserting that "when applied to New York, there are certain inadequacies in the methodologies underlying the federal risk program."  *See* Guidance Document.  She cites three specific alleged inadequacies in the federal methodology:

29

- The federal risk adjustment methodology allegedly does not adequately address the impact of carriers' administrative costs and profit;

- The federal risk adjustment methodology allegedly is distorted by how the number of children in a family are counted;

- The federal risk adjustment methodology allegedly fails to account for network differences, plan efficiencies, effective care coordination, and disease management. *Id.*

88.     All of the issues New York raises were specifically addressed by HHS in crafting the federal risk adjustment formula.

89.     **Administrative costs.**   HHS   specifically   rejected   comments   requesting administrative costs be included in "$P_s$," the Statewide Average Premium calculation, noting "the concern that including fixed administrative costs in the Statewide average premium may increase risk adjustment transfers for all issuers based on a percentage of costs that are not related to enrollee risk."  *See* Discussion Paper, p. 92 (5.5.1. Including Administrative Costs in the Statewide Average Premium).  HHS nonetheless noted that it was "continuing to evaluate the impact of administrative expenses on risk adjustment transfers, and *may* consider this adjustment beyond the 2018 benefit year."  *Id.* (emphasis added)

90.     **Family size.**  HHS also considered the counting of children in families, which relates to "ARF," the Allowable Rating factor.  HHS explicitly rejected New York's preferred family tiering solution, in part because family size is already accounted for in another factor, the plan liability risk score ("PLRS").  "The Federal rules for family rating allow an issuer to charge a premium only for up to three children. . . . [A]verage plan liability risk scores do take family size into account by including the actuarial risks of non-billable family members in the calculation of the average over all billable enrollees."  *See* Discussion Paper, p. 85, 87 (§§ 5.3.1, 5.3.4).

91.     Further, HHS had already modified the ARF formula:

> "We note that some States [including New York] use family tiering rating factors . . . To account for the differences in family rating practices between family tiering States and non-family tiering States, we finalized a modification to the ARF formula for family tiering States in the second Program Integrity Rule (78 Federal Register 65056) and a further clarification in the 2016 Payment Notice (80 Federal Register 10750)."

*See* Discussion Paper, p. 87 § 5.3.4).

92.     **Additional factors.**     Finally, HHS specifically considered the factors the Defendant claims the federal program "fail[s] to account for," HHS having in its Discussion Paper discussed "network differences, plan efficiency, or effective care coordination or disease management." *See* Discussion Paper, p. 93 (5.5.2. Potential Change to the Transfer Formula). While HHS is interested in "exploring . . . ways of addressing such plan differences," HHS was not prepared to change the formula because "of potential sources of error . . . as well as the risks of creating unintended incentives." *Id.*

93.     This lawsuit does not require that the Court confirm all the choices made in the federal risk adjustment formula. This lawsuit does ask the Court to determine that New York cannot make independent changes to those choices, or to the federal risk adjustment formula in general, without first complying with all of the procedural and substantive requirements established by the federal risk adjustment regulations, including the requirement that the state obtain HHS approval before changing the federal risk adjustment regulations by adopting its own risk adjustment formula.

## CLAIMS FOR RELIEF

### COUNT I

### CONFLICT PREEMPTION – 2017 EMERGENCY REGULATION SUPREMACY CLAUSE OF THE U.S. CONSTITUTION

94.    The allegations contained in paragraphs 1 through 93 are incorporated by reference herein.

95.    The Supremacy Clause, U.S. Const. art. VI, cl. 2, provides that the laws of the United States are "the supreme law of the land." Federal law supersedes and invalidates state law when state law or regulations conflict with federal laws (conflict preemption).

96.    The 2017 Emergency Regulation directly conflicts with the risk adjustment program administered by HHS pursuant to the ACA. By explicitly reversing up to 30 percent of the required payments made under the federal risk adjustment program, that Regulation directly conflicts with HHS's formula for making payments to health plans in amounts that HHS has deemed are appropriate to compensate those plans for having enrollees with higher than average health risks, based upon the risk adjustment methodology and formula established by HHS.

97.    The 2017 Emergency Regulation directly conflicts with the risk adjustment program administered by HHS pursuant to the ACA because it purports to modify and non-conformingly re-write specific elements of the federal formula.

98.    The 2017 Emergency Regulation also directly conflicts with the ACA and its regulations by ignoring the requisite steps a State must take if it wants to displace the HHS risk adjustment methodology and establish its own state methodology, resulting in a different amount of money being transferred to the health plan with lower than state average risk than would have been received under the HHS methodology. Federal regulations require that a State wishing to operate an alternative risk adjustment program must be approved in advance by HHS. 45 C.F.R.

§ 153.310(a)(2).  This approval must take place prior to publication of the State's notice of benefit and payment parameters for the applicable benefit year.  *Id.* § 153.310(a)(4).  The substantive and procedural requirements for obtaining approval of a state risk adjustment program are detailed, *see* ¶¶ 60–62, *supra*.  New York has not undertaken, much less fulfilled, any of these steps.

99.   The 2017 Emergency Regulation thus directly and openly conflicts with ACA regulation 45 C.F.R. § 153.310(a)(3), which provides:

> Any State that elects to operate an Exchange but does not elect to administer risk adjustment *will forgo implementation of all State functions in this subpart* [referencing Subpart D, "State Standards Related to the Risk Adjustment Program"], and HHS will carry out all of the provisions of this subpart on behalf of the State

(emphasis added), as well as 45 C.F.R. § 153.310(a)(4), which provides:

> Beginning in 2015, any State that is approved to operate an Exchange and elects to operate risk adjustment *but has not been approved by HHS to operate risk adjustment prior to publication of its State notice of benefit and payment parameters for the applicable benefit year, will forgo implementation of all State functions in this subpart*, and HHS will carry out all of the provisions of this subpart on behalf of the State.

(emphasis added).

100.   For all of these reasons, the 2017 Emergency Regulation directly conflicts with the federal regulatory scheme established by the ACA and its regulations to balance disproportional shares of higher risk and claims costs in the small group health insurance market, and is therefore preempted.

## COUNT II

### CONFLICT PREEMPTION – 2017 EMERGENCY REGULATION
### SUPREMACY CLAUSE OF THE U.S. CONSTITUTION

101.    The allegations contained in paragraphs 1 through 100 are incorporated by reference herein.

102.    The Supremacy Clause, U.S. Const. art. VI, cl. 2, provides that the laws of the United States are "the supreme law of the and."  Federal law supersedes and invalidates state law when state law or regulations interferes with, or frustrates the purposes of, federal laws.

103.    The 2017 Emergency Regulation interferes with, and frustrates the purposes of, the risk adjustment program administered by HHS pursuant to the ACA, and is preempted by federal law.  By explicitly reversing up to 30 percent of payments made under the federal risk adjustment program, the 2017 Emergency Regulation directly conflicts with the fulfillment of the Government's efforts to make payments to health plans in amounts that HHS has deemed are appropriate to compensate those plans for having enrollees with higher than average health risks, based upon the risk adjustment methodology established by HHS.

104.    For these reasons, the 2017 Emergency Regulation interferes with, and frustrates the purposes of, the federal regulatory scheme established by the ACA and its regulations to balance risk in the small group insurance market, and is therefore preempted.

## COUNT III

### UNLAWFUL TAKING – 2017 EMERGENCY REGULATION
### FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION

105.    The allegations contained in paragraphs 1 through 104 are incorporated by reference herein.

106.    The Fifth Amendment of the U.S. Constitution prohibits government takings of private property for public use without just compensation.  U.S. Const. amend V.

107. The Fifth Amendment's Takings Clause is applied to the States through the Fourteenth Amendment of the U.S. Constitution. Takings claims under the Fifth and Fourteenth Amendments of the U.S. Constitution may accordingly be brought with respect to governmental actions by state or local entities.

108. Receivers of federal risk adjustment payments under the risk adjustment mechanism administered by HHS, including Plaintiffs, have an identifiable property interest in those funds, which are calculated annually and paid pursuant to the risk adjustment formula created by HHS.

109. The 2017 Emergency Regulation, under which the Superintendent may demand that Plaintiffs pay the Department of Financial Services of the State of New York a substantial portion (up to 30%) of those funds for the Superintendent to re-distribute to other insurers in the state, is an unconstitutional taking of Plaintiffs' property without just compensation.

110. As a direct, foreseeable, and proximate result of the Superintendent's taking of federal risk adjustment funds to which Plaintiffs are entitled, Plaintiffs will suffer substantial financial losses.

111. While the typical remedy for a governmental taking is just compensation, and a property owner must ordinarily pursue just compensation under any available state law remedies before it can claim a violation of the Fifth Amendment by a state or local government, this doctrine, even where applicable, is only a matter of prudential ripeness, not a jurisdictional bar to a federal court action.

112. Furthermore, resorting to court remedies for just compensation is not required, even as a matter of prudential ripeness, when the taking is of money, as opposed to other types of property. Where the challenged governmental conduct, rather than burdening real or physical

property, requires a direct transfer of funds, the payment of those funds, followed by a claim for just compensation, would entail an utterly pointless set of activities, as every dollar paid pursuant to the state action would be presumed to generate a dollar of compensation. When the challenged conduct relates to an alleged taking of money, declaratory and injunctive relief against the taking is proper.

113.    Plaintiffs are accordingly entitled to declaratory and injunctive relief barring the Superintendent from exercising the powers established by the 2017 Emergency Regulation.

## COUNT IV

### ILLEGAL EXACTION – 2017 EMERGENCY REGULATION
### FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION

114.    The allegations contained in paragraphs 1 through 113 are incorporated by reference herein.

115.    An illegal exaction involves a deprivation of property without due process of law, in violation of the Due Process Clause of the Fifth Amendment to the Constitution, made applicable to the states through the Fourteenth Amendment. Monetary exactions are functionally equivalent to other types of land use exactions. An illegal exaction can arise out of Government action that requires or would require the payment to it of money that was improperly exacted or taken from the claimant in contravention of the Constitution, a statute, or a regulation. The doctrine of illegal exaction may be applied against states, in addition to the federal government.

116.    Fifth Amendment taking claims and illegal exaction claims are two sides of the same coin: taking claims are based upon authorized actions by government officials, whereas illegal extraction claims are based upon unauthorized actions of government officials. Counts III and IV are therefore pleaded in the alternative.

36

117.    The 2017 Emergency Regulation unlawfully conditions Plaintiffs' participation in the New York small group insurance market on the relinquishment of federal funds apportioned to it under the HHS-administered risk adjustment program.  The Superintendent's exercise of her authority under the 2017 Emergency Regulation would operate as an illegal exaction because it provides for the unauthorized taking from Plaintiffs of money owed to them under the federal risk adjustment program.

## COUNT V

### VIOLATION OF 42 U.S.C. § 1983 – 2017 EMERGENCY REGULATION

118.    The allegations contained in paragraphs 1 through 117 are incorporated by reference herein.

119.    This action is brought against Defendant in her official capacity as Superintendent of the Department of Financial Services of the State of New York, to prevent her *inter alia* from enforcing the 2017 Emergency Regulation that violates the Fifth and Fourteenth Amendments of the U.S. Constitution.

120.    42 U.S.C. § 1983 provides a cause of action for violations of these constitutional provisions by a person acting under color of state law.

121.    By implementing and enforcing the 2017 Emergency Regulation, Defendant is depriving Plaintiffs of their rights under the federal Affordable Care Act and the United States Constitution.

## COUNT VI

### CONFLICT PREEMPTION – PROPOSED 2018 PERMANENT REGULATION
### SUPREMACY CLAUSE OF THE U.S. CONSTITUTION

122.    The allegations contained in paragraphs 1 through 121 are incorporated by reference herein.

123.    The Supremacy Clause, U.S. Const. art. VI, cl. 2, provides that the laws of the United States are "the supreme law of the land." Federal law supersedes and invalidates state law when state law or regulations conflict with federal laws (conflict preemption).

124.    To the extent adopted or otherwise effectuated, the proposed 2018 Permanent Regulation directly conflicts with the risk adjustment program administered by HHS pursuant to the ACA. By explicitly reversing up to 30 percent of payments made under the federal risk adjustment program, that Regulation directly conflicts with HHS's formula for making payments to health plans in amounts that HHS has deemed are appropriate to compensate those plans for having enrollees with higher than average health risks, based upon the risk adjustment methodology and formula established by HHS.

125.    The proposed 2018 Permanent Regulation directly conflicts with the risk adjustment program administered by HHS pursuant to the ACA because it purports to modify and re-write specific elements of the federal formula.

126.    By explicitly reversing up to 26 percent of payments made under the federal risk adjustment program, that Regulation directly conflicts with HHS's formula for making payments to health plans in amounts that HHS has deemed are appropriate to compensate those plans for having enrollees with higher than average health risks, based upon the risk adjustment methodology and formula established by HHS.

127.    The proposed 2018 Permanent Regulation also directly conflicts with the ACA and its regulations regarding the steps a state must take if it wants to displace the HHS risk adjustment methodology and establish its own methodology, resulting in a different amount of money being paid to the health plan than would have been paid under the HHS methodology. Federal regulations require that a state wishing to operate an alternative risk adjustment program

must be approved in advance by HHS.  45 C.F.R. § 153.310(a)(2).  This approval must take place prior to publication of the state's notice of benefit and payment parameters for the applicable benefit year.  *Id.* § 153.310(a)(4).  The substantive and procedural requirements for obtaining approval of a state risk adjustment program are detailed, *see* ¶¶ 60–62, *supra*.  New York has not undertaken, much less fulfilled, any of these steps.

128.  The proposed 2018 Permanent Regulation thus directly and openly conflicts with ACA regulation 45 C.F.R. § 153.310(a)(3), which provides:

> Any State that elects to operate an Exchange but does not elect to administer risk adjustment *will forgo implementation of all State functions in this subpart* [referencing Subpart D, "State Standards Related to the Risk Adjustment Program"], and HHS will carry out all of the provisions of this subpart on behalf of the State

(emphasis added), as well as 45 C.F.R. § 153.310(a)(4), which provides:

> Beginning in 2015, any State that is approved to operate an Exchange and elects to operate risk adjustment *but has not been approved by HHS to operate risk adjustment prior to publication of its State notice of benefit and payment parameters for the applicable benefit year, will forgo implementation of all State functions in this subpart*, and HHS will carry out all of the provisions of this subpart on behalf of the State.

(emphasis added).

129.  For all of these reasons, the proposed 2018 Permanent Regulation directly conflicts with the federal regulatory scheme established by the ACA and its regulations to balance the potential for a disproportionate share of higher health risks and claims costs in the individual and small group insurance markets, and is therefore preempted.

## COUNT VII

## CONFLICT PREEMPTION – PROPOSED 2018 PERMANENT REGULATION
## SUPREMACY CLAUSE OF THE U.S. CONSTITUTION

130.   The allegations contained in paragraphs 1 through 129 are incorporated by reference herein.

131.   The Supremacy Clause, U.S. Const. art. VI, cl. 2, provides that the laws of the United States are "the supreme law of the land." Federal law supersedes and invalidates state law when state law or regulations interferes with, or frustrates the purposes of, federal laws.

132.   To the extent adopted or otherwise effectuated, the proposed 2018 Permanent Regulation interferes with, and frustrates the purposes of, the risk adjustment program administered by HHS pursuant to the ACA, and is preempted by federal law. By explicitly reversing up to 30 percent of payments made under the federal risk adjustment program, the proposed 2018 Permanent Regulation directly conflicts with the fulfillment of the Government's efforts to make payments to health plans in amounts that HHS has deemed are appropriate to compensate those plans for having enrollees with higher than average health risks, based upon the risk adjustment methodology established by HHS.

133.   For these reasons, the proposed 2018 Permanent Regulation interferes with, and frustrates the purposes of, the federal regulatory scheme established by the ACA and its regulations to balance risk in the individual and small group insurance markets, and is therefore preempted.

## COUNT VIII

## UNLAWFUL TAKING – PROPOSED 2018 PERMANENT REGULATION
## FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION

134.   The allegations contained in paragraphs 1 through 133 are incorporated by reference herein.

135.    The Fifth Amendment of the U.S. Constitution prohibits government takings of private property for public use without just compensation.  U.S. Const. amend V.

136.    The Fifth Amendment's Takings Clause is applied to the States through the Fourteenth Amendment of the U.S. Constitution.  Takings claims under the Fifth and Fourteenth Amendments of the U.S. Constitution may accordingly be brought with respect to governmental actions by state or local entities.

137.    Receivers of federal risk adjustment payments under the risk adjustment mechanism administered by HHS, including Plaintiffs, have an identifiable property interest in those funds, which are calculated annually and paid pursuant to the risk adjustment formula created by HHS.

138.    To the extent adopted or otherwise effectuated, the proposed 2018 Permanent Regulation, under which the Superintendent may demand that Plaintiffs pay the Department of Financial Services of the State of New York a substantial portion (up to 30%) of those funds for the Superintendent to re-distribute to other insurers in the state, is an unconstitutional taking of Plaintiffs' property without just compensation.

139.    As a direct, foreseeable, and proximate result of the Superintendent's taking of federal risk adjustment funds to which Plaintiffs are entitled, Plaintiffs will suffer substantial financial losses.

140.    While the typical remedy for a governmental taking is just compensation, and a property owner must ordinarily pursue just compensation under any available state law remedies before it can claim a violation of the Fifth Amendment by a state or local government, this doctrine, even where applicable, is only a matter of prudential ripeness, not a jurisdictional bar to a federal court action.

141.    Furthermore, resorting to court remedies for just compensation is not required, even as a matter of prudential ripeness, when the taking is of money, as opposed to other types of property.  Where the challenged governmental conduct, rather than burdening real or physical property, requires a direct transfer of funds, the payment of those funds, followed by a claim for just compensation, would entail an utterly pointless set of activities, as every dollar paid pursuant to the state action would be presumed to generate a dollar of compensation.  When the challenged conduct relates to an alleged taking of money, declaratory and injunctive relief against the taking is proper.

142.    Plaintiffs are accordingly entitled to declaratory and injunctive relief barring the Superintendent from exercising the powers established by the proposed 2018 Permanent Regulation.

## COUNT IX

### ILLEGAL EXACTION – PROPOSED 2018 PERMANENT REGULATION
### FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION

143.    The allegations contained in paragraphs 1 through 142 are incorporated by reference herein.

144.    An illegal exaction involves a deprivation of property without due process of law, in violation of the Due Process Clause of the Fifth Amendment to the Constitution, made applicable to the states through the Fourteenth Amendment.  Monetary exactions are functionally equivalent to other types of land use exactions.  An illegal exaction can arise out of Government action that requires or would require the payment to it of money that was improperly exacted or taken from the claimant in contravention of the Constitution, a statute, or a regulation.  The doctrine of illegal exaction may be applied against states, in addition to the federal government.

145.    Fifth Amendment taking claims and illegal exaction claims are two sides of the same coin: taking claims are based upon authorized actions by government officials, whereas illegal extraction claims are based upon unauthorized actions of government officials.  Counts VIII and IX are therefore pleaded in the alternative.

146.    To the extent adopted or otherwise effectuated, the proposed 2018 Permanent Regulation unlawfully conditions Plaintiffs' participation in the New York small group and individual insurance markets on the relinquishment of federal funds apportioned under the HHS-administered risk adjustment program.  The Superintendent's exercise of her authority under the proposed 2018 Permanent Regulation would operate as an illegal exaction because it provides for the unauthorized taking from Plaintiffs of money owed to them under the federal risk adjustment program.

## COUNT X

**VIOLATION OF 42 U.S.C. § 1983 – PROPOSED 2018 PERMANENT REGULATION**

147.    The allegations contained in paragraphs 1 through 146 are incorporated by reference herein.

148.    This action is brought against Defendant in her official capacity as Superintendent of the Department of Financial Services of the State of New York, to prevent her *inter alia* from enforcing a state regulation that violates the Fifth and Fourteenth Amendments of the U.S. Constitution.

149.    42 U.S.C. § 1983 provides a cause of action for violations of these constitutional provisions by a person acting under color of state law.

150.    By implementing and enforcing the proposed 2018 Permanent Regulation, Defendant is depriving Plaintiffs of their rights under the federal Affordable Care Act and the United State Constitution.

## PRAYER FOR RELIEF

In light of the foregoing, Plaintiffs respectfully request the following relief:

A.      A declaration, pursuant to 28 U.S.C. § 2201, that the 2017 Emergency Regulation is invalid because it violates the federal Affordable Care Act and regulations thereunder, 42 U.S.C. § 1983, and the Supremacy Clause, Fifth Amendment, and Fourteenth Amendment of the United States Constitution, and is preempted by federal law and null and void and unenforceable;

B.      An injunction barring the Superintendent or those acting in concert with her from enforcing or exercising the authority established by the 2017 Emergency Regulation and ordering the Superintendent to withdraw that Regulation;

C.      A declaration, pursuant to 28 U.S.C. § 2201, that the proposed 2018 Permanent Regulation is invalid because it violates the federal Affordable Care Act and regulations thereunder, 42 U.S.C. § 1983, and the Supremacy Clause, Fifth Amendment, and Fourteenth Amendment of the United States Constitution, and is preempted by federal law and null and void and unenforceable;

D.      An injunction barring the Superintendent or those acting in concert with her from enforcing or exercising the authority established by the proposed 2018 Permanent Regulation and ordering the Superintendent to withdraw that Regulation;

E.      An order awarding Plaintiffs' reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

F.      Such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s Jon-Michael Dougherty
Steven J. Rosenbaum
Jon-Michael Dougherty
COVINGTON & BURLING LLP
One City Center
850 Tenth Street N.W.
Washington, DC  20001-4956
Tel: (202) 662-5568
Fax: (202) 778-5568
srosenbaum@cov.com
jdougherty@cov.com

*Attorneys for Plaintiffs*

Dated: October 6, 2017