UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITEDHEALTHCARE OF NEW YORK, INC.,
ET AL.,

                      Plaintiffs,

        - against -

MARIA T. VULLO, in her official
capacity as Superintendent of
Financial Services of the State of
New York,

                 Defendant.

17-cv-7694 (JGK)

OPINION & ORDER

JOHN G. KOELTL, District Judge:

       The plaintiffs, UnitedHealthcare of New York and Oxford
Health Insurance, Inc., bring this action against the defendant,
Maria T. Vullo, the Superintendent of Financial Services of the
State of New York. This case involves the interplay between a
proposed risk adjustment program by the New York State
Superintendent of Financial Services for individual and small
group insurance markets in New York State, and a federal risk
adjustment program under the Affordable Care Act (the "ACA"). A
risk adjustment program attempts to balance risks to insurers by
requiring insurers with less risky groups of insureds to
contribute to a pool to assist insurers with more risky pools.
The plaintiffs contend that some of the funds awarded to them by
the federal program will be taken away to assist other insurers
in New York State because of specific New York State

considerations. They contend that the New York State program is therefore preempted by the federal program and constitutes and unconstitutional taking and illegal exaction of their property in violation of the Fifth and Fourteenth Amendments and 42 U.S.C. § 1983. The defendant moves to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The plaintiffs have moved for summary judgment.

I.

In defending a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiffs bear the burden of proving the Court's jurisdiction by a preponderance of the evidence. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). In considering such a motion, the Court generally must accept the material factual allegations in the Complaint as true. See J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004). The Court does not, however, draw all reasonable inferences in the plaintiffs' favor. Id.; Graubart v. Jazz Images, Inc., No. 02-cv-4645, 2006 WL 1140724, at *2 (S.D.N.Y. Apr. 27, 2006). Indeed, where jurisdictional facts are disputed, the Court has the power and the obligation to consider matters outside the pleadings, such as affidavits, documents, and testimony, to determine whether jurisdiction exists. See APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003); Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998); Kamen

v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986). In doing so, the Court is guided by that body of decisional law that has developed under Federal Rule of Civil Procedure 56. Kamen, 791 F.2d at 1011; see also Donelli v. Cty. of Sullivan, No. 07-cv-2157 (JGK), 2009 WL 2365551, at *1 (S.D.N.Y. July 31, 2009).

On a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true. Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998). In deciding a motion to dismiss pursuant to Rule 12(b)(6), all reasonable inferences must be drawn in the plaintiffs' favor. Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiffs have stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff[s] plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the

3

Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id. When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

## II.

The following facts are taken from the plaintiffs' complaint and from public documents of which the Court can take judicial notice. The facts alleged in the complaint are accepted as true for purposes of the defendant's motion.

This case concerns the interaction of two government programs that were developed to regulate the health insurance market. One program was authorized by New York State and implemented by the defendant, Superintendent Vullo. The second program was authorized by the federal government and is implemented by two agencies of the federal government, the Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"). The plaintiffs'

4

claims in this case concern the interaction of the state program with the federal program.

Both the state and federal programs are "risk adjustment" programs that operate in the health insurance market. The purpose of a risk adjustment program is "to encourage insurers to compete for enrollees' business based on the value and efficiency of an insurer's particular health insurance plan, rather than only competing for the healthiest enrollees." Compl. ¶ 27. Risk adjustment programs fulfill this purpose by requiring insurers with enrollees who are healthier than the state-covered average in a given plan year to make payments into a common fund. Compl. ¶ 28. Those funds are then transferred to insurers that incurred higher claim costs due to having enrollees who are sicker than the state-covered average in that same plan year. Compl. ¶ 28. This system eliminates an insurer's incentive to seek to cover only the healthiest individuals, because such an insurer will be required to pay into the fund if its overall population of insureds is heathier than the state average. Various methodologies are employed by risk adjustment programs to determine which insurance companies must pay into the fund and which insurance companies are owed money from the fund in any given plan year.

In 1992, New York State enacted a law that required the Superintendent of the Department of Financial Services to

promulgate regulations creating New York-specific risk adjustment pools. N.Y. Insurance Law § 3233. In accordance with this mandate, on March 9, 1993, the Superintendent adopted regulations creating a risk adjustment program for the individual and small group health insurance markets in New York. 11 NYCRR Part 361. From 1993 through 2013, the Superintendent administered this risk adjustment program in New York in the small and individual group insurance markets.

The ACA was enacted in 2010 and made fully operational on January 1, 2014. Compl. ¶ 19. The ACA is administered by HHS and CMS. Compl. ¶ 21. One feature of the ACA was the development of a federal risk adjustment program (the "FRAP"), which the ACA authorized HHS to develop. 42 U.S.C. § 18063. In accordance with this mandate, HHS promulgated regulations establishing the FRAP and rules that would govern the FRAP's administration. 45 C.F.R. § 153.310. Under these regulations, States can choose whether to administer the FRAP themselves or elect to have HHS administer the FRAP on their behalf. 45 C.F.R. § 153.310(a)(3) & (4). If a State elects to administer the FRAP itself, the State must comply with various requirements set forth in the regulation. 45 C.F.R. § 153.310(c) & (d). New York State opted to have HHS implement the FRAP on its behalf. Compl. ¶ 45. HHS therefore operates the FRAP in New York. Compl. ¶ 45.

HHS developed the risk adjustment methodology to be applied under the FRAP. The methodology determines which insurance companies owe money into the program and which companies are owed money from the program in any given plan year. Compl. ¶ 46. The final risk adjustment methodology is "detailed and complex" and has been amended by HHS over time. Compl. ¶ 46. HHS uses data provided by the insurers to calculate the amount of the payments. Compl. ¶ 47.

On May 11, 2016, HHS published an interim final rule that addressed the implementation of the FRAP. 81 Fed. Reg. 29146. With respect to risk adjustment, the rule noted:

> Based on our experience operating the 2014 benefit year risk adjustment program, HHS has become aware that certain issuers, including some new, rapidly growing, and smaller issuers, owed substantial risk adjustment charges that they did not anticipate. HHS has had a number of discussions with issuers and State regulators on ways to help ease issuers' transition to the new health insurance markets and the effects of unanticipated risk adjustment charge amounts. We believe that a robust risk adjustment program that addresses new market dynamics due to rating reforms and guaranteed issue is critical to the proper functioning of these new markets. However, we are sympathetic to these concerns and recognize that States are the primary regulators of their insurance markets. We encourage States to examine whether any local approaches, under State legal authority, are warranted to help ease this transition to new health insurance markets.

81 Fed. Reg. 29146, 29152. The final rule promulgated by HHS on December 22, 2016 included substantively the same language. 81 Fed. Reg. 94058, 94159.

On September 9, 2016, the Superintendent promulgated an emergency regulation, 11 NYCRR § 361.9, pursuant to her authority under the N.Y. Insurance Law § 3233.[1] The Superintendent adopted this regulation on a permanent basis on July 31, 2018 (the "2017 NYRA").[2] See Docket No. 65. The regulation noted that the "federal risk adjustment methodology as applied in [New York] does not yet adequately address" certain factors specific to New York. 11 NYCRR § 361.9(a)(4) & (b)(1). The regulation grants the Superintendent the ability to implement a risk adjustment program in New York for the plan year 2017 if the Superintendent determines, after reviewing the impact of the FRAP to insurers in New York, that such a program is necessary. 11 NYCRR § 361.9(e). The regulation allows the Superintendent to collect up to 30% of the funds received by carriers in the State from the FRAP and to redistribute that amount to other carriers in the State pursuant to a state specific risk adjustment methodology. 11 NYCRR § 361.9(e)(1).

---

[1] The emergency regulation was reissued on December 7, 2016, March 6, 2017, June 2, 2017, July 31, 2017, September 28, 2017, November 24, 2017, January 22, 2018, March 22, 2018, and May 15, 2018. 11 NYCRR § 361.9.

[2] The parties previously agreed that, should the Superintendent finalize and promulgate a permanent regulation for the 2017 plan year, the regulation shall be deemed challenged as part of the plaintiffs' challenge to the emergency regulation. Docket No. 53.

On May 3, 2017, the Superintendent promulgated a proposed permanent regulation establishing a risk adjustment program for the plan years 2018 and thereafter. Compl. ¶ 73. See also 11 NYCRR § 361.10. The regulation was adopted on a permanent basis on July 31, 2018 (the "2018 NYRA"). See Docket No. 65. The regulation adopts similar procedures for the implementation of a risk adjustment program as the 2017 NYRA.[3]

On April 17, 2018, HHS and CMS issued a final rule addressing adjustments to its prior rules implementing the ACA and implementing new regulations effective June 8, 2018. With respect to the risk adjustment programs, the 2019 Final Rule noted:

> However, we recognize that States are the primary regulators of their insurance markets. In the May 2016 Interim Final Rule, HHS recognized some State regulators' belief that reducing the magnitude of risk adjustment charge amounts could be beneficial to the insurance markets in their States. For some States, an adjustment to risk adjustment transfers calculated under the HHS-operated risk adjustment program might more precisely account for cost differences attributable to adverse selection in the respective State market risk pools. We encouraged States to examine whether any local approaches under State legal authority are warranted to help ease the transition for new entrants to the health insurance markets and mitigate the effects of large risk adjustment charge amounts.

---

[3] Because the "[2017 NYRA] and [2018 NYRA] are substantively identical" "[f]or purposes relevant to this lawsuit", Compl. ¶ 73, all of the Court's findings in this opinion with respect to the 2017 NYRA also apply to the 2018 NYRA.

83 Fed. Reg. 16930, 16956. The 2019 Final Rule also addressed
several comments regarding the 2017 NYRA. 83 Fed. Reg. 16930,
16960. The rule reiterated that "States are the primary
regulators of their insurance markets, and as such, we encourage
States to examine whether any local approaches under State legal
authority are warranted," and that "States that take action and
make adjustments do not generally need HHS approval as these
States are acting under their own State authority and using
State resources." 83 Fed. Reg. 16930, 16960.

The plaintiffs, UnitedHealthcare of New York and Oxford
Health Insurance, are health insurance companies that offer
insurance policies in the State of New York. Compl. ¶¶ 12-13.
Both plaintiffs have been in the past, and expect to be with
respect to benefit years 2017 and 2018, recipients of risk
adjustment payments under the FRAP. Compl. ¶ 65.

The plaintiffs allege two sets of claims.

First, the plaintiffs allege that the 2017 NYRA and the
2018 NYRA, which purport to collect funds received by the
plaintiffs under the FRAP for redistribution to other insurers
in New York, are preempted by the ACA and the Supremacy Clause
of the Constitution. See Compl. ¶¶ 94-100 (Count I); ¶¶ 101-104
(Count II); ¶¶ 122-29 (Count VI); ¶¶ 130-133 (Count VII).

Second, the plaintiffs allege that the 2017 NYRA and the
2018 NYRA will effect an unconstitutional taking or illegal

exaction of their property in violation of the Fifth and
Fourteenth Amendments and 42 U.S.C. § 1983.  See
Compl. ¶¶ 105-113 (Count III); ¶¶ 114-117 (Count IV); ¶¶ 118-121
(Count V); ¶¶ 134-142 (Count VIII); ¶¶ 143-146 (Count IX);
¶¶ 147-150 (Count X).

The defendant has moved to dismiss all of the plaintiffs'
claims.

With respect to the preemption claims, the defendant first
argues that the Court has no subject matter jurisdiction to
review the claims because the plaintiffs do not rely on a
federal statute or any other provision of federal law that
establishes a cause of action to assert a preemption challenge.
The defendant also argues that, even if the Court does have
jurisdiction to review the claims, the preemption claims have no
merit because the state regulations do not conflict with the
ACA.

With respect to the takings and illegal exaction claims,
the defendant first argues that the Court has no subject matter
jurisdiction to review the claims because they are not ripe.
The defendant also argues that the claims have no merit because
the plaintiffs do not have any vested interest in the property
they claim will be unlawfully taken, and further, that their
takings claims merely restate their flawed preemption arguments.

Lastly, the defendant argues that this Court should abstain from deciding this case under the Burford abstention doctrine.

## III.

The plaintiffs' First and Second claims for relief allege that the 2017 NYRA is preempted by federal law. The plaintiffs' Sixth and Seventh claims for relief allege that the 2018 NYRA is preempted by federal law.

## A.

The defendant argues initially that the Court does not have subject matter jurisdiction over the plaintiffs' preemption claims because the plaintiffs do not allege a cause of action for preemption pursuant to the federal constitution or any federal statute.

The plaintiffs argue that there is jurisdiction over their claims for declaratory and injunctive relief under the Supreme Court's decision in Ex Parte Young, 209 U.S. 123 (1908). In Ex Parte Young, the Court held that federal courts have jurisdiction over suits to enjoin state officials from taking unconstitutional actions. Id. at 155-63.

However, the defendant argues that the plaintiffs' injunctive claims are precluded by the Supreme Court's decision in Armstrong v. Exceptional Child Center, Inc., 125 S. Ct. 1378 (2015). In Armstrong, the Supreme Court held that the "power of the federal courts of equity to enjoin unlawful executive action

is subject to express and implied statutory limitations." Id. at 1385; see Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton, 841 F.3d 133, 145 (2d Cir. 2016). The Court held that the statute at issue in that case, the Medicaid Act, "implicitly preclude[d] private enforcement." Armstrong, 125 S. Ct. at 1385.

The Court noted two aspects of the Medicaid Act that it believed established Congress's implicit "intent to foreclose" equitable relief for alleged violation of that statute. Id. First, the Court noted that "the sole remedy Congress provided for the State's failure to comply with Medicaid's requirements . . . is the withholding of Medicaid funds by the Secretary of Health and Human Services." Id. (recognizing that "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others"). And second, even if this sole remedy "might not, by itself, preclude the availability of equitable relief", it did so "when combined with the judicially unadministrable nature of § 30(A)'s text." Id. In sum, "[t]he sheer complexity associated with enforcing § 30(A), coupled with the express provision of an administrative remedy . . . shows that the Medicaid Act precludes private enforcement of § 30(A) in the courts." Id.

Here, the ACA "cannot be analogized to the Medicaid statute in either of the two ways prompting jurisdictional concern in

Armstrong." <u>East Hampton</u>, 841 F.3d at 145.[4]  First, unlike

§ 30(A) of the Medicaid Act, the ACA does not provide a "sole

remedy" for violations of the statute, nor is that sole remedy a

loss of federal funding.  Rather, the ACA provides for both an

administrative remedy that allows HHS to implement the FRAP to

remedy state failures, <u>see</u> 42 U.S.C. § 18041(c)(1)(B)(ii)(II),

and legal remedies in the form of civil penalties, <u>see</u> 42 U.S.C.

§ 300gg-22(b)(2)(A).  Specifically, 42 U.S.C.

§ 18041(c)(1)(B)(ii)(II) directs the Secretary to "take such

actions as are necessary to implement [the FRAP] requirements."

This remedy is far broader than the simple remedy of withholding

federal funds that the court in <u>Armstrong</u> found indicative of an

intent to forbid equitable relief.  And the fact that the ACA

also allows the Secretary to seek civil penalties for violations

of the ACA further indicates that it was not Congress's intent

to limit the types of remedies that may be sought for violations

of the statute to a sole administrative remedy.

42 U.S.C. § 300gg-22(b)(2)(A).

    Second, the ACA's provisions governing the establishment of

a risk adjustment plan are not "judicially unadministrable"

_____

[4] The defendant does not argue that there is an express statutory
limitation in the ACA forbidding private citizens from suing to
enjoin a state official under <u>Ex Parte Young</u>.  The defendant
argues only that there is an implied limitation.

14

under the standard set forth in <u>Armstrong</u>.  In <u>Armstrong</u>, the
Court found that the Medicaid Act's mandate that "state plans
provide for payments that are 'consistent with efficiency,
economy, and quality of care' all the while 'safeguard[ing]
against unnecessary utilization of . . . care and services" was
broad and unspecific.  135 S. Ct. at 1385.  Unlike this broad
mandate in the Medicaid Act, however, the ACA implementing
regulations set forth specific requirements for a State that
wishes to administer the FRAP itself.  45 C.F.R. §§ 153.310(c) &
(d).  These provisions require the State to submit a complete
description of its risk adjustment model and sets forth various
specific requirements for that description.
45 C.F.R. §§ 153.310(d).  These directives are hardly
"judicially unadministrable" -- rather, they provide clear
direction for a court that is asked to determine whether a
State's risk adjustment program complies with the ACA or whether
the State's regulations are preempted.  See <u>East Hampton</u>, 841
F.3d at 147.  The plaintiffs in this case are not asking the
Court to evaluate New York State's risk adjustment program but
simply to determine whether the 2017 NYRA is preempted by the
ACA.  Unlike in <u>Armstrong</u> where the Court was asked to engage in
a "judgment laden review" of an extremely broad directive in the
statute that provided the Court with virtually no direction,
here, the regulations themselves set forth specific requirements

that the plaintiffs argue the State has failed to satisfy in enacting the 2017 NYRA.

Accordingly, with respect to risk adjustment, the ACA does not strip private citizens of their long-standing right under Ex Parte Young to invoke federal jurisdiction to enjoin a state entity from subjecting them to a local law enacted in alleged violation of federal requirements. See East Hampton, 841 F.3d at 146.

## B.

The defendant next argues that, even if the Court has subject matter jurisdiction to review the plaintiffs' preemption claim, the plaintiffs' claim should be dismissed because the ACA does not preempt the 2017 NYRA.

"Preemption can generally occur in three ways: where Congress has expressly preempted state law, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law, or where federal law conflicts with state law." Wachovia Bank, N.A. v. Burke, 414 F.3d 305, 313 (2d Cir. 2005).

The plaintiffs argue that three provisions of the ACA expressly preempt the 2017 NYRA. These arguments are meritless.

First, the plaintiffs argue that section 18041(d) of the Act, which directly addresses the issue of preemption, expressly prohibits the 2017 NYRA. That section states: "Nothing in this

16

title shall be construed to preempt any State law that does not prevent the application of the provisions of this title."
42 U.S.C. § 18041(d).

But this provision makes clear that state regulations are not preempted unless they "prevent the application" of the ACA. Id. This provision -- which sets forth a presumption against preemption -- is in accord with the historical role of the States as the primary regulators of the insurance business. See U.S. Dep't of Treasury v. Fabe, 508 U.S. 491, 507 (1993) ("[S]tate laws enacted for the purpose of regulating the business of insurance do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise." (internal quotation marks omitted)). As discussed below, the 2017 NYRA does not prevent the application of the ACA, but rather is a complementary provision to the FRAP designed to take into account unintended local consequences in New York. The 2017 NYRA is therefore not expressly preempted by this provision.

The plaintiffs' reliance on § 300gg-23(a)(1) of the Act as expressly preempting the 2017 NYRA fares no better. That provision states:

> (a) Continued applicability of State law with respect to health insurance issuers
> (1) In general
> Subject to paragraph (2) and except as provided in subsection (b) of this section, this part and part C of this subchapter insofar as it relates to this part shall not be construed to supersede any provision of State law which establishes, implements, or continues in effect any standard or requirement solely relating to health insurance issuers in connection with individual or group health insurance coverage except to the extent that such standard or requirement prevents the application of a requirement of this part.

42 U.S.C. § 300gg–23 (emphases added). Like § 18041(d), this provision sets forth a presumption against preemption. And, as discussed below, the 2017 NYRA does not prevent the application of any requirements of the ACA and therefore the 2017 NYRA is not preempted by this section.

Third, the plaintiffs argue that the 2017 NYRA is expressly preempted by 45 C.F.R. §§ 153.310(a)(3) and (4). Those provisions state:

> (3) Any State that elects to operate an Exchange but does not elect to administer risk adjustment will forgo implementation of all State functions in this subpart, and HHS will carry out all of the provisions of this subpart on behalf of the State.
> (4) Beginning in 2015, any State that is approved to operate an Exchange and elects to operate risk adjustment but has not been approved by HHS to operate risk adjustment prior to publication of its State notice of benefit and payment parameters for the applicable benefit year, will forgo implementation of all State functions in this subpart, and HHS will carry out all of the provisions of this subpart on behalf of the State.

Id. (emphases added). The plaintiffs argue that, because the Superintendent did not seek approval by HHS to implement the

18

state risk adjustment program, the 2017 NYRA was promulgated in violation of the directive that a State must "forgo implementation of all State functions in this subpart." Id. But the 2017 NYRA does not seek "to operate risk adjustment" under the federal regulation. Rather, New York has ceded to HHS the responsibility of developing and administering the FRAP in New York State.

Section 153.310 requires a State to seek approval of HHS to "implement a risk adjustment program for a benefit year [that] administer[s] the applicable Federally certified risk adjustment methodology". § 153.310(c)(1). But the 2017 NYRA does not seek to administer the "Federally certified risk adjustment methodology." Rather, the Superintendent has sought to implement a risk adjustment program authorized by a state statute that is administered based on a risk adjustment methodology developed by the State and designed to take into account state-specific parameters. Accordingly, in promulgating the 2017 NYRA, the Superintendent has not sought to "implement" any part of § 153.310.

The ACA also does not preempt the 2017 NYRA under the doctrine of field preemption. As an initial matter, 42 U.S.C. § 18041(d) and § 300(gg)-23(a)(1) plainly leave some authority to the States to continue to regulate their insurance markets. And this reservation of regulatory power to the States

is in accord with the historical presumption that States are the primary regulators of the insurance business. See Fabe, 508 U.S. at 507. If Congress intended to preempt all state risk adjustment programs, it is unlikely it would have included provisions expressly leaving to the States the power to promulgate any regulations that did not conflict with the ACA.

Moreover, statements made by HHS and CMS after the adoption of the ACA make plain that the ACA was not intended to occupy the entire field of risk adjustment. HHS has published several statements after the enactment of the ACA that explicitly set forth its understanding of the States' role in the implementation of risk adjustment programs, and in those statements HHS has made clear that it believes the States still have a role to play.

In May 2016, HSS published an interim final rule in the Federal Register which discussed the FRAP. HHS acknowledged that there had been some unanticipated consequences of the FRAP but reiterated its commitment to -- and the value of -- risk adjustment programs. HHS went on to state: "[W]e are sympathetic to these concerns and recognize that States are the primary regulators of their insurance markets. We encourage States to examine whether any local approaches, under State legal authority, are warranted to help ease this transition to new health insurance markets." 81 Fed. Reg. 29146, 29152. The

final rule promulgated in December 2016 also contained this language. 81 Fed. Reg. 94058, 94159.[5]

These express declarations by HSS and CMS indicate that the ACA was not intended to be comprehensive in the field such that it preempted any state action in the area of risk adjustment. To the contrary, HHS and CMS have explicitly acknowledged that the regulation of insurance has historically been left to the States and that some significant flexibility in implementing these regulations was left to the States by the ACA.

Finally, there is no conflict between the FRAP and the 2017 NYRA, nor does the 2017 NYRA "stand as an obstacle to the achievement of the federal goals and objectives." Pls.' Mem. Supp. Mot. Partial Summ. J. 25.

The plaintiffs argue that 45 C.F.R. § 153.310 sets forth specific requirements for a State to run its own risk adjustment program and that allowing a State to circumvent those requirements by adopting a regulation pursuant to state law frustrates the federal goals of the ACA. They argue that it is "simply implausible" that HHS would have established methods of

---

[5] The plaintiffs argue that this language comes from the preambles of the proposed rulemakings and therefore has no legal effect. But even if these statements are not legally binding, they still shed light on HHS's understanding of the purposes and effects of the FRAP.

approval of a state risk adjustment program if those methods
could be avoided by adopting a risk adjustment program pursuant
to state law. The Superintendent has adopted a state risk
adjustment program that operates after the FRAP has determined
the adjustments to be made and after the payments are made using
the federal methodology.

But the requirements set forth in § 153.310 only apply to
States who opt to implement the FRAP themselves. In other
words, if a State wishes to "administer the applicable Federally
certified risk adjustment methodology" itself, it must comply
with the requirements set forth in § 153.310. But that
provision does not require a State to seek HHS approval to
implement a risk adjustment program that is governed by risk
adjustment methodologies developed by that State, that takes
into consideration state-specific concerns, and that is meant to
remedy unintended consequences of the FRAP in the State.

Here, the Superintendent seeks to implement a state risk
adjustment program pursuant to a state insurance law passed more
than 25 years ago that granted the Superintendent the power to
develop a risk adjustment program for the State. See N.Y.
Insurance Law § 3233. The Superintendent seeks to use a risk
adjustment methodology developed by the State that is sensitive
to factors unique to the New York health insurance markets and
intended to remedy the adverse consequences of the FRAP in New

York. See 11 NYCRR § 361.9(a)(4) ("The federal risk adjustment methodology as applied in this State does not adequately address the impact of administrative costs and profit of the carriers and how this State counts children in certain calculations."); id. at (b)(1) ("The [S]uperintendent anticipate that the federal risk adjustment program will adversely impact the small group health insurance market in this State in 2017 . . . ."). The development of such a program does not conflict with § 153.310 because it does not seek to implement the FRAP, but rather seeks to develop a separate risk adjustment program focused on remedying adverse consequences of the FRAP in New York.

Additionally, HHS has explicitly acknowledged that such local programs may be necessary and encouraged States to consider adopting them. The defendant has represented that there were such adverse consequences from the FRAP on the health insurance market in New York. See Second Powell Decl. ¶ 41, Docket No. 40 ("Since the implementation of [the FRAP], two companies operating in New York's small group market, both of whom were required to make large payments into the [FRAP], have left the market. . . . The departure of both of these insurers has had negative and destabilizing effects on the health insurance market in New York with adverse impacts for both consumers and small businesses."); 11 NYCRR § 361.9(a)(2) ("In certain respects, however, the calculations for the federal risk

adjustment program do not take into account certain factors, resulting in unintended consequences."). The 2017 NYRA seeks to resolve those unintended consequences of the FRAP by using state authority to adopt a state specific risk adjustment program. The 2017 NYRA does not impede the federal program, but instead is complementary to the FRAP and furthers the purposes of the FRAP.

A final rule issued by CMS in April 2018, adopting regulations effective June 18, 2018, makes plain that the FRAP is not intended to preempt state programs. The rule addressed adjustments made to CMS's prior regulations implementing the ACA. With respect to risk adjustment, the rule reiterated:

> However, we recognize that States are the primary regulators of their insurance markets. In the May 2016 Interim Final Rule, HHS recognized some State regulators' belief that reducing the magnitude of risk adjustment charge amounts could be beneficial to the insurance markets in their States. For some States, an adjustment to risk adjustment transfers calculated under the HHS-operated risk adjustment program might more precisely account for cost differences attributable to adverse selection in the respective State market risk pools. We encouraged States to examine whether any local approaches under State legal authority are warranted to help ease the transition for new entrants to the health insurance markets and mitigate the effects of large risk adjustment charge amounts.

83 Fed. Reg. 16930, 16956.

The plaintiffs argue that, despite this language, the final rule actually supports their position, because it also introduces a new regulation, that will take effect in the 2020

24

benefit year, that allows States to request a reduction to the federal risk adjustment transfers of up to 50 percent "in States where HHS operates the risk adjustment program."
45 C.F.R. § 153.320(d). The regulation requires States to submit a proposal explaining the need for the adjustment and gain approval by HHS. 83 Fed. Reg. 16930, 16956; 45 C.F.R. § 153.320(d). The plaintiffs argue that the 2017 NYRA accomplishes the exact same reduction contemplated by this regulation, but does so without HHS approval. Accordingly, the plaintiffs argue that this regulation is a signal from HHS that States may not unilaterally make those reductions, but must submit a proposal for those reductions and gain approval of HHS. Essentially, the plaintiffs argue that, because HHS has set forth in a regulation a pathway for the States to request the very reduction that the defendant seeks to accomplish with the 2017 NYRA, HHS plainly believes those reductions should only be completed through this pathway and with HHS approval.

But the final rule also directly addressed the 2017 NYRA in response to comments made about that regulation, and CMS made clear that the new regulation was not meant to displace State action taken pursuant to State authority. 83 Fed. Reg. 16930, 16960. The final rule noted:

[a] few commentators noted that New York has already taken action to reduce transfers under the State's authority, and requested clarification whether other States could take steps under existing State authority. One commenter noted that the New York adjustment could be seen as permitting States to make adjustment without HHS approval and requested clarification that States making adjustments to the risk adjustment formula must first obtain approval from HHS under the risk adjustment program prior to implementing any State-specific adjustments.

Id. In response, rather than condemning the New York program as contrary to the FRAP, the rule reiterated that "States are the primary regulators of their insurance markets". Id. The rule continued:

[W]e encourage States to examine whether any local approaches under State legal authority are warranted to help ease the transition for new participants to the health insurance markets. States that take action and make adjustments do not generally need HHS approval as these States are acting under their own State authority and using State resources. However, the flexibility finalized in this rule involves a reduction to the risk adjustment transfers calculated by HHS and will require HHS review as outlined above.

Id. Thus, the final rule makes clear that the new regulation allowing States to request a reduction of the federal risk adjustment amount does not displace any state programs operated under state authority. Rather, it confirms that each State may take action pursuant to its own authority, but also notes that, if the State instead chooses to request a reduction from HHS, the State must submit that proposal for approval in accordance with 45 C.F.R. § 153.320(d). Thus, under the ACA and the

implementing regulations as amended by the final rule, States have two options for addressing any unintended negative impacts of the FRAP in their local markets: (1) take action and make adjustments pursuant to state authority; or (2) request an adjustment to the federal risk adjustment transfers from HHS in accordance with the procedures set forth in 45 C.F.R. § 153.210.

In sum, the fact that the agencies responsible for implementing the FRAP -- HHS and CMS -- have repeatedly stated that States may turn to their own authority to adjust for unintended consequences of the FRAP -- and have acknowledged that there have been such unintended consequences -- is strong evidence that the ACA does not preempt the 2017 NYRA.[6]

Accordingly, the plaintiffs' argument that the 2017 NYRA is preempted by the ACA is without merit. The defendant's motion to dismiss the First, Second, Sixth, and Seventh counts is **granted**.

---

[6] The text of the regulation effective June 18, 2018 entitled "Federally certified risk adjustment methodology" provides: "Any risk adjustment methodology used by a State, or HHS on behalf of the State, must be a Federally certified risk adjustment methodology." 45 C.F.R. § 153.320(a). The parties have not discussed the meaning of this particular section of the new regulation, but it is best understood as a description of the procedure and provisions for the federal risk adjustment methodology rather than a prohibition on the States from developing their own state risk adjustment methodologies to take into account individual state situations, which appears to have been endorsed by the accompanying rule. See 83 Fed. Reg. 16930, 16960.

**IV.**

The plaintiffs' Third, Fourth, and Fifth claims for relief allege that the 2017 NYRA will effect an unlawful taking or illegal exaction of their property. The plaintiffs' Eighth, Ninth, and Tenth claims for relief make the same claims with respect to the 2018 NYRA.

**A.**

First, the defendant argues that the Court does not have jurisdiction over the plaintiffs' takings claims because they are not ripe.

The purpose behind the doctrine of constitutional ripeness is to "prevent[ ] a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig., 725 F.3d 65, 110 (2d Cir. 2013) (quoting Ross v. Bank of Am., N.A. (USA), 524 F.3d 217, 226 (2d Cir. 2008)). A requirement for constitutional ripeness is "that the plaintiff's injury be imminent rather than conjectural or hypothetical." Id.; Coffran v. N.Y.C. Pension Fund, 46 F.3d 3, 4 (2d Cir. 1995) (per curiam) ("Article III court[s] cannot entertain a claim which is based upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (quoting Oriental Health Spa v. City of Fort Wayne, 864 F.2d 486, 489

(7th Cir. 1988))); see also Schulz v. Cuomo, 22 N.Y.S.3d 602,
605-06 (App. Div. 2015) (dismissing as not ripe for adjudication
a declaratory judgment action seeking to bar certain officials
from participating as delegates to the Constitutional Convention
because it was speculative that the Convention would ever
occur). "A plaintiff must allege something more than an
abstract, subjective fear that his rights are chilled in order
to establish a case or controversy." Nat'l Org. for Marriage,
Inc. v. Walsh, 714 F.3d 682, 689 (2d Cir. 2013). See also Davis
v. Kosinsky, 217 F. Supp. 3d 706, 709-10 (S.D.N.Y. 2016), aff'd
sub nom. Davis v. N.Y.S. Bd. of Elections, 689 F. App'x 665 (2d
Cir. 2017).

However, "[a]n allegation of future injury may suffice if
the threatened injury is certainly impending, or there is a
substantial risk that the harm will occur." Susan B. Anthony
List v. Driehaus, 134 S. Ct. 2334, 2341 (2014) (internal
quotation marks omitted). "[T]he question in each case is
whether the facts alleged, under all the circumstances, show
that there is a substantial controversy, between parties having
adverse legal interests, of sufficient immediacy and reality to
warrant the issuance of a declaratory judgment." MedImmune,
Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007).

With respect to the claims for relief regarding the 2017
NYRA (Counts Four, Five, and Six), the controversy is ripe

because, while the claim is contingent on a future event --
namely the actual implementation of the 2017 NYRA -- statements
made by the Superintendent make plain that there is a
"substantial risk" that some portion of the plaintiffs' payout
from the FRAP will be taken from them by the Superintendent
pursuant to the 2017 NYRA.

The 2017 NYRA has been adopted on a permanent basis and is
currently in effect.  See Docket No. 65. The 2017 NYRA grants
discretionary authority to the Superintendent to administer a
state risk adjustment program if "after reviewing the impact of
the federal risk adjustment program on the small group health
insurance market . . . the [S]uperintendent determines that a
market stabilization mechanism is a necessary amelioration, the
superintendent shall implement a market stabilization pool in
such market."  11 NYCRR § 361.9(e).  The Superintendent has
stated that, barring "extraordinary circumstances", she will
exercise her authority under this regulation and seize 30% of
the amount the plaintiffs' receive under the FRAP.  Def.'s Rule
56.1 Statement ¶ 53.  Counsel for the plaintiffs also stated at
oral argument that it was "highly likely" that the
Superintendent would exercise such authority.  The federal
government has announced that it intends to make payments under
the FRAP in October 2018, see Docket No. 64-2, and the
plaintiffs have only 10 days from receiving payment under the

FRAP, or an invoice from the Superintendent, whichever is later, to remit the portion to the State directed by the Superintendent, see 11 NYCRR § 361.9(e)(1)(ii). Accordingly, the plaintiffs have shown that there is a substantial likelihood that they will suffer imminent injury, and the unlawful takings and illegal exactions claims regarding the 2017 NYRA are thus ripe for review.

However, the claims for relief regarding the 2018 NYRA are not ripe for review. While the 2018 NYRA has been adopted on a permanent basis, the Superintendent has not made similar assurances regarding the likelihood of implementation of the 2018 NYRA. HHS also has not announced the adjustments it intends to make under the FRAP or when those adjustments will be made. It is not even clear at this point whether the plaintiffs will receive a payment under the FRAP for the 2018 plan year that would then be subject to the 2018 NYRA. Accordingly, the unlawful takings and illegal exactions claims regarding the 2018 NYRA are thus not ripe for review.

**B.**

The defendant also argues that, even if the takings claims are ripe, they should be dismissed because the plaintiffs have failed to allege that the 2017 NYRA constitutes an unlawful taking or an illegal exaction.

As an initial matter, it is not unconstitutional for the
Superintendent to require insurance companies to pay into a risk
adjustment pool to ensure the proper functioning of the health
insurance market in the State. The 2017 NYRA serves the
rational purpose of ensuring that the insurance markets in the
State run efficiently and "prevent[ing] unnecessary instability
for carriers participating in the small group health insurance
market" in New York. 11 NYCRR § 361.9(b)(2). The regulation
setting up the New York State risk adjustment program -- 11
NYCRR Part 361 -- has been upheld by the Appellate Division,
Third Department of the New York State Supreme Court as a valid
exercise of the Legislature's power to regulate. Colonial Life
Ins. Co. of Am. v. Curiale, 617 N.Y.S.2d 377, 380 (App. Div.
1994); see also Health Ins. Ass'n of Am. v. Harnett, 376 N.E.2d
1280, 1283-84 (N.Y. 1978) ("At the outset we observe that
insurance is a business to which the government has long had a
special relation; regulation of the industry, closely related as
it is to the public interest, is surely a proper subject for the
state's exercise of its police power . . . . The business of
writing insurance is not a right; it is a privilege granted by
the State subject to the conditions imposed by the State and to
its control and supervision." (internal quotation marks and
citations omitted)).

The plaintiffs argue that the taking is unconstitutional because they are entitled to receive these funds from the FRAP, and the State is not permitted to take some of those funds to which they are entitled under _federal_ law pursuant to a _state_ risk adjustment program. But this argument simply merges the plaintiffs' takings claims with their preemption claims. As explained above, the 2017 NYRA is not preempted by the ACA, and thus the taking of a portion of the funds remitted to the plaintiffs pursuant to the FRAP is not unconstitutional.

Accordingly, the 2017 NYRA does not constitute an unlawful taking or an illegal exaction.[7]

---

[7] The plaintiffs' claims under 42 U.S.C. § 1983 (Counts Five and Ten) are premised on their claims for unlawful takings and illegal exactions under the Fifth and Fourteenth Amendments. Compl. ¶¶ 118-121. Accordingly, because there is no valid claim for a violation of the Fifth and Fourteenth Amendments, the plaintiffs' Fifth and Tenth causes of action under § 1983 must be dismissed. See Patterson v. Cty. of Oneida, N.Y., 375 F.3d 206, 225 (2d Cir. 2004) ("Section 1983 is not itself a source of substantive rights. It merely provides a method for vindicating federal rights elsewhere conferred . . . ." (internal quotation marks and citations omitted)).

## V.

Finally, the defendant argues that the Court should abstain from deciding this case pursuant to the Burford abstention doctrine. Burford v. Sun Oil Co., 319 U.S. 315 (1943).

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976). This obligation is subject to certain well-recognized exceptions based on various abstention doctrines, including Burford abstention. Burford abstention is appropriate where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." Id. at 814. Courts look to three factors to determine whether Burford abstention is appropriate: "[1] the degree of specificity of the state regulatory scheme, [2] the necessity of discretionary interpretation of state statutes, and [3] whether the subject matter of the litigation is traditionally one of state concern." Bethphage Lutheran Serv., Inc. v. Weicker, 965 F.2d 1239, 1243 (2d Cir. 1992).

The resolution of this case does not require the Court to analyze or interpret the intricacies of state insurance law. This case does not require the Court to give one or another

debatable construction to a state statute or rely on the administrative expertise of state officers. Bethphage, 965 F.2d at 1244-45. Rather, the plaintiffs ask this Court to determine whether the state regulation is preempted by federal law or whether the implementation of the regulation effects an unlawful taking because it conflicts with a federal program established by the ACA. The resolution of these issues does not require the Court to resolve any difficult questions of construction in the state law. See Bethphage, 965 F.2d at 1243 ("[T]he aim of Burford abstention is to avoid resolving difficult state law issues involving important public policies or avoid interfering with state efforts to maintain a coherent policy in an area of comprehensive regulation or administration." (internal citation omitted)). The resolution of this case does not require the Court to construe a state statute at all.

Accordingly, Burford abstention should not be applied in this case.

## VI.

The plaintiffs have cross-moved for partial summary judgment with respect to Counts I through V of the Complaint, the Counts that challenge the 2017 NYRA based on allegations that the regulation is preempted by the ACA and effects an unconstitutional taking and exaction. The plaintiffs seek a permanent injunction.

The plaintiffs are not entitled to summary judgment or a permanent injunction because the Court has dismissed their claims finding them to be without merit. Because the Court has dismissed all of the plaintiffs' claims as explained above, and there is plainly no actual success on the merits, the plaintiffs' motions for summary judgment and for an injunction are **denied**.

## CONCLUSION

The Court has considered all of the remaining arguments of the parties. To the extent not specifically addressed above, they are either moot or without merit. For the foregoing reasons, the defendant's motion to dismiss is **granted** and the plaintiffs' motions for partial summary judgment and for an injunction are **denied**. Counts I-VII are dismissed **with prejudice**. Counts VIII-X are dismissed **without prejudice** for lack of jurisdiction.

The Clerk of Court is directed to enter judgment dismissing this action and closing this case. The Clerk is also directed to close all pending motions.

**SO ORDERED**.

Dated:    **New York, New York**
          **August 11, 2018**

_____
          **John G. Koeltl**
          **United States District Judge**

36